

EXHIBIT

A

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PNC BANK, NATIONAL ASSOCIATION, successor by merger to PNC EQUIPMENT FINANCE, LLC, | ) ) ) |
| | ) Case No. 24-1762 |
| Plaintiff, | ) |
| v. | ) ) |
| PAN OPTIC IMAGING LLC, DENA SUHAIL, and SAMEER SUHAIL, | ) ) ) |
| Defendants. | ) ) |

## VERIFIED COMPLAINT FOR REPLEVIN AND MONEY DAMAGES

NOW COMES Plaintiff PNC Bank, National Association, successor by merger to PNC Equipment Finance, LLC ("PNC"), by and through counsel, and for its Verified Complaint for Replevin and Money Damages against Pan Optic Imaging LLC ("Pan Optic"), Dena Suhail, and Sameer Suhail (collectively, the "Defendants"), states as follows:

### PARTIES

1.     PNC Bank, National Association is a national banking association with its principal place of business in the State of Pennsylvania, and is the successor to PNC Equipment Finance, LLC as a result of the merger on May 1, 2022.  PNC's main office is located in Wilmington, Delaware.

2.     Pan Optic is an Illinois limited liability company with its principal place of business located at 155 N. Michigan Ave., Suite 634, Chicago, IL 60601.

3.     Dena Suhail is a citizen of the State of Illinois who, upon information and belief, resides at 1401 N Wabash Ave., Unit 31A, Chicago, IL 60611.

1

4. Sameer Suhail is a citizen of the State of Illinois who, upon information and belief, resides at 1401 N Wabash Ave., Unit 31A, Chicago, IL 60611.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) insomuch as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2), because a substantial part of the events or omissions giving rise to PNC's claims occurred in this judicial district, and because the Defendants reside in this judicial district.

## FACTS COMMON TO ALL COUNTS

7. On July 17, 2018, Pan Optic executed a Promissory Note ("Note No. xx0267-1") in favor of PNC for the principal amount of $771,876.00 for value received and in accordance with the contemporaneously executed security agreement. See Note No. xx0267-1, attached hereto as Exhibit 1.

8. Pursuant to Note No. xx0267-1, Pan Optic agreed to make seventy-two (72) consecutive monthly payments of $12,679.57. See Note No. xx0267-1, ¶ 2, attached hereto as Exhibit 1.

9. Also on July 17, 2018, PNC, as lender, and Pan Optic, as borrower, entered into a Security Agreement (Note No. xx0267-1 and the Security Agreement are collectively referred to as the "Agreement") wherein Pan Optic granted PNC a security interest in the following equipment: One (1) GE Signa 1.5T 12X HD MRI System, and One (1) Siemens Biograph 16 PET CT Scanner, with all accessories, parts, attachments, service, maintenance, warranty, training, and

2

software (collectively the "Equipment"), as described on Schedule A attached thereto. <u>See</u> Security Agreement attached hereto as Exhibit 2.

10.    PNC perfected its security interest in the Equipment by filing its UCC-1 financing statement. <u>See</u> UCC-1 financing statement attached hereto as Exhibit 3.

11.    To induce PNC to enter into the Agreement, Dena Suhail executed a Guaranty Agreement (the "Dena Suhail Guaranty") wherein Dena Suhail guaranteed the full and prompt payment and performance of all of Pan Optic's obligations to PNC. <u>See</u> Dena Suhail Guaranty attached hereto as Exhibit 4.

12.    To induce PNC to enter into the Agreement, Sameer Suhail also executed a Guaranty Agreement (the "Sameer Suhail Guaranty") wherein Sameer Suhail guaranteed the full and prompt payment and performance of all of Pan Optic's obligations to PNC. <u>See</u> Sameer Suhail Guaranty attached hereto as Exhibit 5.

13.    Pan Optic failed to make the payment due under the Agreement on July 20, 2023, and all payments due thereafter.

14.    Dena Suhail failed to make payment as required pursuant to the Dena Suhail Guaranty.

15.    Sameer Suhail failed to make payment as required pursuant to the Sameer Suhail Guaranty.

16.    Upon the occurrence of default, PNC is entitled to declare immediately due and payable the accelerated principal balance and accrued interest, together with any additional amounts payable under the Agreement, which is $127,299.92 as of January 20, 2024. <u>See</u> Exhibit 1, ¶ 11.

17.    PNC is further entitled to payment of late charges. <u>See</u> Exhibit 1, ¶ 3.

18.     PNC is entitled to prejudgment interest at the default rate, which is 8.69% per annum, calculated at 3% in excess of the interest rate in effect under Note No. xx0267-1.  <u>See</u> Exhibit 1, ¶ 3.

19.     PNC is further entitled to attorneys' fees and costs.  <u>See</u> Exhibit 2, ¶ 7.

20.     Upon an event of default, PNC is also entitled to possession of the Equipment. <u>See</u> Exhibit 2, ¶ 6.

21.     Pan Optic has failed and refused to make payment due and owing under the Agreement despite demand.

<div align="center">

**COUNT I**
<u>**BREACH OF CONTRACT AGAINST PAN OPTIC**</u>

</div>

22.     PNC repeats and realleges paragraphs 1 through 21 as though fully set forth herein.

23.     PNC has fully performed its obligations under the Agreement.

24.     Pan Optic defaulted under the Agreement by failing to make all necessary payments when due.

25.     As a result of Pan Optic's payment default, PNC is entitled to payment of $127,299.92, plus late charges, prejudgment interest accruing at the rate of 8.69% per annum from the date of default until entry of judgment, and attorneys' fees and costs.

WHEREFORE, Plaintiff PNC Bank, National Association, successor by merger to PNC Equipment Finance, LLC, respectfully requests that this Court enter Judgment in its favor and against Pan Optic Imaging LLC in the amount of $127,299.92, plus late charges, prejudgment interest accruing at the rate of 8.69% per annum from the date of default until entry of judgment, and attorneys' fees and costs, and grant such other and further relief as this Court deems just.

## COUNT II
## BREACH OF GUARANTY AGAINST DENA SUHAIL

26.     PNC repeats and realleges paragraphs 1 through 25 as though fully set forth herein.

27.     Dena Suhail defaulted under the Dena Suhail Guaranty by failing and refusing to make payment when due under the Agreement and her guaranty thereof.

28.     As a result of Dena Suhail's payment default under the Dena Suhail Guaranty, PNC is entitled to payment in the amount of $127,299.92, plus late charges, prejudgment interest accruing at the rate of 8.69% per annum from the date of default until entry of judgment, and attorneys' fees and costs.

WHEREFORE, Plaintiff PNC Bank, National Association, successor by merger to PNC Equipment Finance, LLC, respectfully requests that this Court enter Judgment in its favor and against Dena Suhail in the amount of $127,299.92, plus late charges, prejudgment interest accruing at the rate of 8.69% per annum from the date of default until entry of judgment, and attorneys' fees and costs, and grant such other and further relief as this Court deems just.

## COUNT III
## BREACH OF GUARANTY AGAINST SAMEER SUHAIL

29.     PNC repeats and realleges paragraphs 1 through 28 as though fully set forth herein.

30.     Sameer Suhail defaulted under the Sameer Suhail Guaranty by failing and refusing to make payment when due under the Agreement and the guaranty thereof.

31.     As a result of Sameer Suhail's payment default under the Sameer Suhail Guaranty, PNC is entitled to payment in the amount of $127,299.92, plus late charges, prejudgment interest accruing at the rate of 8.69% per annum from the date of default until entry of judgment, and attorneys' fees and costs.

WHEREFORE, Plaintiff PNC Bank, National Association, successor by merger to PNC Equipment Finance, LLC, respectfully requests that this Court enter Judgment in its favor and against Sameer Suhail in the amount of $127,299.92, plus late charges, prejudgment interest accruing at the rate of 8.69% per annum from the date of default until entry of judgment, and attorneys' fees and costs, and attorneys' fees and costs, and grant such other and further relief as this Court deems just.

## COUNT IV
## REPLEVIN AGAINST PAN OPTIC

32.     PNC repeats and realleges paragraphs 1 through 31 as though fully set forth herein.

33.     This Count is brought pursuant to 735 ILCS § 5/19-101, *et seq*., made applicable to this proceeding pursuant to Federal Rule of Civil Procedure 64.

34.     PNC has a first priority security interest in the Equipment: One (1) GE Signa 1.5T 12X HD MRI System, and One (1) Siemens Biograph 16 PET CT Scanner, with all accessories, parts, attachments, service, maintenance, warranty, training, and software.

35.     As a result of Pan Optic's default under the Agreement, PNC is entitled to exercise its contractual right to take possession of the Equipment.  See Exhibit 2, ¶ 6.

36.     PNC has been unable to secure the Equipment by peaceful means.

37.     Pan Optic is wrongfully and unlawfully detaining the Equipment from PNC.

38.     The Equipment has not been taken for any tax, assessment, or fine levied by virtue of any law of this State, against the property of such plaintiff, or against him or her individually, nor seized under any lawful process against the goods and chattels of such plaintiff subject to such lawful process, nor held by virtue of an order of replevin against such a plaintiff.

39.     PNC has made demand upon Pan Optic for the return of the Equipment, but Pan Optic has failed and refused to return same.

40. PNC will suffer irreparable damages if the Equipment is not returned to PNC.

41. PNC estimates the value of the Equipment at $225,000.00, depending on market and condition.

42. Upon information and belief, the Equipment is located at 155 N. Michigan Ave., Suite 634, Chicago, IL 60601.

WHEREFORE, Plaintiff PNC Bank, National Association, successor by merger to PNC Equipment Finance, LLC, respectfully requests that this Court entered an Order directing the U.S. Marshal, or any other designated officer, to use all necessary force to repossess the Equipment, or any portion thereof from Pan Optic Imaging LLC at 155 N. Michigan Ave., Suite 634, Chicago, IL 60601, or wherever it may be found, and enter a judgment against Pan Optic Imaging LLC for the value of any portion of the Equipment not so returned, plus attorneys' fees and costs, as well as all other and further relief which this Court deems just.

## COUNT IV
## DETINUE AGAINST PAN OPTIC

43. PNC repeats and realleges paragraphs 1 through 42 as though fully set forth herein.

44. The Equipment is in Pan Optic's possession and control.

45. PNC is entitled to possession of the Equipment due to the payment default under the Agreement. See Exhibit 2, ¶ 6.

46. Pan Optic is wrongfully retaining possession of the Equipment, because Pan Optic defaulted under the terms of the Agreement by failing to make timely payments when due, and Pan Optic has failed to surrender the Equipment despite demand.

WHEREFORE, Plaintiff PNC Bank, National Association, successor by merger to PNC Equipment Finance, LLC, respectfully requests that this Court entered an Order compelling Pan

Optic Imaging LLC to surrender the Equipment to PNC at a place and time directed by PNC within

fourteen (14) days of this Court's entry of judgment.

<div style="margin-left: 40%;">

PNC BANK, NATIONAL ASSOCIATION, successor by merger to PNC Equipment Finance, LLC,

By:     /s/ C. Randall Woolley
        C. Randall Woolley
        Darcy & Devassy PC
        444 N. Michigan Ave, Suite 3270
        Chicago, IL 60611
        Tel: (312) 784-2400
        Fax; (312) 784-2410
        rwoolley@darcydevassy.com

</div>

## **VERIFICATION BY CERTIFICATION**

  Under penalties as provided by law, the undersigned certifies that the statements set forth in the Verified Complaint for Replevin and Money Damages are true and correct, except as to matters therein stated to be on information and belief, and as to such matters, the undersigned certified as aforesaid that he verily believes the same to be true.

  Declared under penalty of perjury this __27th__ day of __February__, 2024.

            _____
            Christopher Wilms
            Vice President Operations Group Manager
            PNC Bank, National Association, successor
            by merger to PNC Equipment Finance, LLC



**PNC**
EQUIPMENT FINANCE

**Term Note**

**EXHIBIT**

**1**


| 771,876.00 | Note Date:<br>July 17, 2018 | Loan # ███267-1 |
|---|---|---|

**FOR VALUE RECEIVED, PAN OPTIC IMAGING LLC** ("Borrower"), with an address at 155 N Michigan Avenue, Suite 634, Chicago, IL 60601, promises to pay to the order of **PNC EQUIPMENT FINANCE, LLC** ("Lender"), in lawful money of the United States of America in immediately available funds at its offices located at 995 Dalton Avenue, Cincinnati, Ohio 45203, or at such other location as Lender may designate from time to time, the principal sum of SEVEN HUNDRED SEVENTY-ONE THOUSAND EIGHT HUNDRED SEVENTY-SIX DOLLARS and 00/100 ($771,876.00) ("Facility"), together with interest accruing on the outstanding principal balance from the date hereof, all as provided below.

**1. RATE OF INTEREST:** Amounts outstanding under this Note will bear interest as follows (check one):

☐ A. A rate per annum ("**Floating Rate**") which is at all times equal to the Base Rate plus _____ (_____) basis points (_____%).

☒ B. A rate per annum ("**Fixed Rate**") which is at all times equal to five and sixty nine hundredths percent (5.69%).

Interest will be calculated based on a 30 day calendar month of a 360 day year. In no event will the rate of interest hereunder exceed the maximum rate allowed by law.

For purposes hereof, the following terms shall have the following meanings:

"**Bank**" means PNC Bank, National Association.

"**Base Rate**" shall mean the LIBOR Rate, applicable during each respective Contract Period, so long as a LIBOR Rate is offered, ascertainable and not unlawful. If and when the Base Rate (or any component thereof) changes, the rate of interest with respect to any advance bearing interest at the Floating Rate will change automatically without notice to the Borrower, effective on the date of any such change. In the event the LIBOR Rate is unavailable as a result of Bank's or Lender's reasonable determination, the rate of interest for this Note shall be a fluctuating rate equal to the Prime Rate.

"**Business Day**" shall mean any day other than a Saturday or Sunday or a legal holiday on which commercial banks are authorized or required to be closed for business in Cincinnati, Ohio.

"**Contract Period**" means a period commencing on a Business Day and ending one month thereafter on the last day of the respective month, *provided* that (a) if any Contract Period otherwise would end on a day that is not a Business Day ("Non-Business Day"), for purposes of determining any next adjustment to the LIBOR Rate hereunder only, it shall end instead on the next preceding day that is a Business Day as the last day (although any such adjusted LIBOR Rate shall be applied on the day following said Non-Business Day as the intended start of the next Contract Period), (b) if any Contract Period commences on a day for which there is no numerical equivalent in the calendar month in which that Contract Period is to end, it shall end on the last calendar day of that calendar month unless such a day is not a Business Day, in which case, for purposes of determining any next adjustment to the LIBOR Rate hereunder only, it shall end instead on the next preceding day that is a Business Day as the last day (although any such adjusted LIBOR Rate shall be applied on the day following said Non-Business Day as the intended start of the next Contract Period), and (c) the first Contract Period shall commence on the later of the date of this Note or the date of initial disbursement of any portion of the face amount hereof and each subsequent Contract Period, to the extent applicable, shall commence automatically and immediately on the last day of the preceding Contract Period.

"**LIBOR Rate**" shall mean, for a Contract Period, the rate per annum determined by Lender by dividing (x) the Published Rate by (y) a number equal to 1.00 minus the percentage prescribed by the Federal Reserve

for determining the maximum reserve requirements with respect to any Eurocurrency fundings by banks on such day; provided, however, if the LIBOR Rate determined as provided above would be less than zero, then such rate shall be deemed to be zero.

"**Prime Rate**" shall mean the rate publicly announced by Lender from time to time as its prime rate. The Prime Rate is determined from time to time by Lender as a means of pricing some loans to its borrowers. The Prime Rate is not tied to any external rate of interest or index, and does not necessarily reflect the lowest rate of interest actually charged by Lender to any particular class or category of customers.

"**Published Rate**" shall mean the rate of interest published each Business Day in the Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one month period (or, if no such rate is published therein for any reason, then the Published Rate shall be the Eurodollar rate for a one month period as published in another publication selected by Lender).

**2. PAYMENT TERMS:** Principal and interest will be payable as provided below:

**Level Payments:** Principal and interest shall be due and payable in seventy two (72) equal consecutive monthly installments in the amount of $12,679.57 each, commencing on _____, 2018, and continuing on the same day of each month thereafter. Any outstanding principal and accrued interest shall be due and payable in full on _____, 20___. The level payment amount is calculated on the assumption that each periodic payment will be made on the date when due, and if there is any variation in the actual payment dates, there may be an additional payment due upon maturity of this Note. Any amortization schedule provided to Borrower is only an estimate, and is superseded by the terms of this Note regarding the accrual and payment of interest.

If any payment under this Note shall become due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest in connection with such payment. Payments received will be applied to charges, fees and expenses (including attorneys' fees), accrued interest and principal in any order Lender may choose, in its sole discretion.

**3. LATE PAYMENTS; DEFAULT RATE:** If the Borrower fails to make any payment of principal, interest or other amount coming due pursuant to the provisions of this Note when due and payable, then Borrower also shall pay to Lender a late charge equal to 5% of the amount of such payment but not more than the maximum amount allowed by law ("**Late Charge**"). Upon maturity, whether by acceleration, demand or otherwise, and at Lender's option upon the occurrence of any Event of Default (as hereinafter defined) and during the continuance thereof, each advance outstanding under this Note shall bear interest at a rate per annum (based on a 30 day calendar month of a 360 day year) which shall be three percentage points (3%) in excess of the interest rate in effect from time to time under this Note but not more than the maximum rate allowed by law ("**Default Rate**"). The Default Rate shall continue to apply whether or not judgment shall be entered on this Note. Both the Late Charge and the Default Rate are imposed as liquidated damages for the purpose of defraying Lender's expenses incident to the handling of delinquent payments, but are in addition to, and not in lieu of, Lender's exercise of any rights and remedies hereunder, under the other Loan Documents or under applicable law, and any fees and expenses of any agents or attorneys which Lender may employ. In addition, the Default Rate reflects the increased credit risk to Lender of carrying a loan that is in default. The Borrower agrees that the Late Charge and Default Rate are reasonable forecasts of just compensation for anticipated and actual harm incurred by Lender, and that the actual harm incurred by Lender cannot be estimated with certainty and without difficulty.

**4. PREPAYMENT:** So long as no Event of Default under this Note has occurred and is continuing, Borrower may, upon 30 days' prior written notice to Lender, prepay to Lender all amounts owed under this Note in full, but not in part, on any payment date, by paying the entire outstanding balance as of such prepayment date, all other amounts due and owing under this Note, plus the Cost of Prepayment, as provided for below.

The "**Cost of Prepayment**" shall be calculated as an amount equal to the following specified percentage, as such applies to the applicable payment installment number, multiplied by the outstanding principal balance owed under this Note;

| Prepayment on Installment Number | Percentage |
|---|---|
| 1st – 12th Months | 6% |
| 13th – 24th Months | 5% |
| 25th – 36th Months | 4% |
| 37th – 48th Months | 3% |
| 49th -60th Months | 2% |
| 61st – 72nd Months | 1% |

A notice as to any amounts payable pursuant to this section given to the Borrower by Lender shall, in the absence of manifest error, be conclusive and shall be payable upon demand. The Borrower's obligations hereunder shall survive the payment in full of the outstanding balance and any other amounts.

**5. INCREASED COSTS; YIELD PROTECTION:** On written demand, together with written evidence of the justification therefor, the Borrower agrees to pay Lender all direct costs incurred, any losses suffered or payments made by Lender as a result of any Change in Law (hereinafter defined), imposing any reserve, deposit, allocation of capital or similar requirement (including without limitation, Regulation D of the Board of Governors of the Federal Reserve System) on Lender, its holding company or any of their respective assets relative to the Facility. "**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any governmental authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any governmental authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by Lender for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

**6. BREAK FUNDING INDEMNIFICATION:** The Borrower agrees to indemnify Lender against any liabilities, losses or expenses (including, without limitation, loss of margin, any loss or expense sustained or incurred in liquidating or employing deposits from third parties, and any loss or expense incurred in connection with funds acquired to effect, fund or maintain any advance (or any part thereof) bearing interest at a Fixed Rate) which Lender sustains or incurs as a consequence of either (i) the Borrower's failure to make a payment on the due date thereof, (ii) the Borrower's revocation (expressly, by later inconsistent notices or otherwise) in whole or in part of any notice given to Lender to request, convert, renew or prepay any advance bearing interest at a Fixed Rate, or (iii) the Borrower's payment or prepayment (whether voluntary (unless allowed for under this Note), after acceleration of the maturity of this Note or otherwise) or conversion of any advance bearing interest at a Fixed Rate on a day other than the regularly scheduled due date therefor. A notice as to any amounts payable pursuant to this section given to the Borrower by Lender shall, in the absence of manifest error, be conclusive and shall be payable upon demand. The Borrower's indemnification obligations hereunder shall survive the payment in full of the advances and all other amounts payable hereunder.

**7. OTHER LOAN DOCUMENTS:** This Note is issued in connection with any letter agreement or loan agreement between the Borrower and Lender, dated on or before the date hereof, and the other agreements and documents executed and/or delivered in connection therewith and herewith or referred to therein, or herein, including, without limitation, the Incorporated Documents, as defined below, the terms of which are all incorporated herein by reference (as amended, modified or renewed from time to time, collectively the "**Loan Documents**"), and is secured by the property (if any) described in the Loan

documents and by each other collateral as previously may have been or may in the future be granted to Lender to secure this Note.

**8. INCORPORATION OF COVENANTS BY REFERENCE; CROSS TERMINATION:** Any and all representations and warranties, and any and all affirmative, negative and financial covenants which may be set forth in any credit agreement, loan agreement, promissory note, guaranty or other agreement, instrument or document entered into between Borrower (or any of its affiliates), as borrower, and any affiliate of Lender, as lender (whether directly as a lender to Borrower or as one lender in a bank syndicate agreeing to lend to the Borrower, or as holder of a participation in a loan by another lender to Borrower) ("**Incorporated Documents**"), are hereby incorporated herein by this reference as if set forth herein at length, as any of the foregoing may be amended or supplemented from time to time ("**Incorporated Provisions**"). Any amendments, modifications, waivers or other changes in the terms of any of the Incorporated Provisions shall automatically constitute an amendment to this Note without any need for further action or documentation. Notwithstanding the foregoing, any such changes to any Incorporated Provision which operate to waive or prevent the occurrence of a default or Event of Default under any Incorporated Document shall not be effective unless consented to in writing by Lender in its sole discretion. If any Incorporated Document terminates or otherwise ceases to be in full force and effect ("**Termination**"), all of the Incorporated Provisions of such Incorporated Document shall survive the Termination and shall continue in full force and effect as a part of this Note. At any time after a Termination, Borrower shall promptly, upon Lender's request, execute and deliver to Lender an amendment to this Note, which amendment will expressly incorporate into this Note all or any number of the Incorporated Provisions of the terminated Incorporated Document as Lender, in its sole discretion, shall select, as such Incorporated Provisions are in effect immediately prior to the date of Termination. Further, notwithstanding the foregoing, the Termination of any Incorporated Document for any reason shall constitute an Event of Default under this Note, entitling Lender, at its option, to terminate this Note and to accelerate the payment of all amounts due hereunder.

**9. COVENANTS:** Unless compliance is waived in writing by the Lender, until payment in full of the loan evidenced by this Note:

a. The Borrower will promptly submit to the Lender such information as the Lender may reasonably request relating to the Borrower's affairs (including but not limited to annual Financial Statements (as hereinafter defined) and tax returns for the Borrower and the guarantor) and/or any security for the loan evidenced by this Note. "**Financial Statements**" means the consolidated and consolidating balance sheet and statements of income and cash flows prepared in accordance with generally accepted accounting principles ("**GAAP**") in effect from time to time applied on a consistent basis (subject in the case of interim statements to normal year-end adjustments).

b. The Borrower together with any guarantor or grantor under the Loan Documents will not make or permit any change in: (i) their form of organization, (ii) the nature of their business as carried on as of the date of this Note or the respective Loan Document, (iii) the composition of their current executive management, or (iv) their equity ownership.

c. The Borrower will notify the Lender in writing of the occurrence of an Event of Default or an act or condition which, with the passage of time, the giving of notice or both might become an Event of Default.

d. The Borrower will provide (i) confirmation of the accuracy of the information set forth in the most recent Certification of Beneficial Owners provided to the Lender, as and when requested by the Lender, (ii) a new Certification of Beneficial Owners in form and substance acceptable to the Lender when the individual(s) identified as a controlling party and/or a direct or indirect individual owner on the most recent Certification of Beneficial Owners provided to the Lender have changed, and (iii) such other information and documentation as may reasonably be requested by the Lender from time to time for purposes of compliance by the Lender with applicable laws (including without limitation the USA Patriot Act and other "know your customer" and anti-money laundering rules and regulations), and any policy or procedure implemented by the Lender to comply therewith.

**10. REPRESENTATIONS AND WARRANTIES:** To induce the Lender to extend the loan evidenced by this Note, the Borrower represents and warrants as follows:

a. The Borrower's latest Financial Statements provided to the Lender are true, complete and accurate in all material respects and fairly present the financial condition, assets and liabilities, whether accrued, absolute,

- 2 -

the period specified therein. The Borrower's Financial Statements have been prepared in accordance with GAAP consistently applied from period to period subject, in the case of interim statements, to normal year-end adjustments. Since the date of the latest Financial Statements provided to the Lender, the Borrower has not suffered any damage, destruction or loss which has materially adversely affected its business, assets, operations, financial condition or results of operations.

b. There are no actions, suits, proceedings or governmental investigations pending or, to the knowledge of the Borrower, threatened against the Borrower which could result in a material adverse change in its business, assets, operations, financial condition or results of operations and there is no basis known to the Borrower or its officers, directors or shareholders for any such action, sut, proceedings or investigation.

c. The Borrower has filed all returns and reports that are required to be filed by it in connection with any federal, state or local tax, duty or charge levied, assessed or imposed upon the Borrower or its property, including unemployment, social security and similar taxes and all of such taxes have been either paid or adequate reserve or other provision has been made therefor.

d. If not a natural person, the Borrower is duly organized, validly existing and in good standing under the laws of the state of its incorporation or organization and has the power and authority to own and operate its assets and to conduct its business as now or proposed to be carried on, and is duly qualified, licensed and in good standing to do business in all jurisdictions where its ownership of property or the nature of its business requires such qualification or licensing.

e. The Borrower has full power and authority to enter into the transactions provided for in this Note and has been duly authorized to do so by all necessary and appropriate action and when executed and delivered by the Borrower, this Note and the other Loan Documents will constitute the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their terms.

f. There does not exist any default or violation by the Borrower of or under any of the terms, conditions or obligations of: (i) its organizational documents; (ii) any indenture, mortgage, deed of trust, franchise, permit, contract, agreement, or other instrument to which it is a party or by which it is bound; or (iii) any law, regulation, ruling, order, injunction, decree, condition or other requirement applicable to or imposed upon the Borrower by any law or by any governmental authority, court or agency.

g. The information in the Certification of Beneficial Owner(s) ("**Certification of Beneficial Owners**") executed and delivered to the Lender on or prior to the date of this Note, as updated from time to time in accordance with this Note, is true, complete and correct as of the date hereof and as of the date any such update is delivered. The Borrower acknowledges and agrees that the Certification of Beneficial Owners is a Loan Document.

**11. EVENTS OF DEFAULT:** The occurrence of any of the following events will be deemed to be an "**Event of Default**" under this Note: (i) the nonpayment of any principal, interest or other indebtedness under this Note when due; (ii) the occurrence of any event of default or any default and the lapse of any notice or cure period, or any Obligor's failure to observe or perform any covenant, representation, warranty or other agreement, under or contained in any Loan Document or any other document now or in the future evidencing or securing any debt, liability or obligation of any Obligor to Lender; (iii) the filing by or against any Obligor of any proceeding in bankruptcy, receivership, insolvency, reorganization, liquidation, conservatorship or similar proceeding (and, in the case of any such proceeding instituted against any Obligor, such proceeding is not dismissed or stayed within 30 days of the commencement thereof, provided that Lender shall not be obligated to advance additional funds hereunder during such period); (iv) any assignment by any Obligor for the benefit of creditors, or any levy, garnishment, attachment or similar proceeding is instituted against any property of any Obligor held by or deposited with Lender: (v) a default with respect to any other indebtedness of any Obligor for borrowed money, if the effect of such default is to cause or permit the acceleration of such debt; (vi) the commencement of any foreclosure or forfeiture proceeding, execution or attachment against any collateral securing the obligations of any Obligor to Lender; (vii) the entry of a final judgment against any Obligor and the failure of such Obligor to discharge the judgment within ten days of the entry thereof; (viii) any change in any Obligor's business, assets, operations, financial condition or results of operations that has or could reasonably be expected to

doing business as a going concern; (x) any representation or warranty made by any Obligor to Lender in any Loan Document or any other documents now or in the future evidencing or securing the obligations of any Obligor to Lender, is false, erroneous or misleading in any material respect; (xi) if this Note or any guarantee executed by any Obligor is secured, the failure of any Obligor to provide Lender with additional collateral if in Lender's opinion at any time or times, the market value of any of the collateral securing this Note or any guarantee has depreciated below that required pursuant to the Loan Documents or, if no specific value is so required, then in an amount deemed material by Lender; (xii) the revocation or attempted revocation, in whole or in part, of any guarantee by any Obligor; or (xiii) the death, incarceration, indictment or legal incompetency of any individual Obligor or, if any Obligor is a partnership or limited liability company, the death, incarceration, indictment or legal incompetency of any individual general partner or member. As used herein, the term "**Obligor**" means any Borrower and any guarantor of, or any pledgor, mortgagor or other person or entity providing collateral support for, the Borrower's obligations to Lender existing on the date of this Note or arising in the future.

Upon the occurrence of an Event of Default: (a) Lender shall be under no further obligation to make advances hereunder; (b) if an Event of Default specified in clause (iii) or (iv) above shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder shall be immediately due and payable without demand or notice of any kind. (c) if any other Event of Default shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder, at Lender's option and without demand or notice of any kind, may be accelerated and become immediately due and payable; (d) at Lender's option, this Note will bear interest at the Default Rate from the date of the occurrence of the Event of Default; and (e) Lender may exercise from time to time any of the rights and remedies available under the Loan Documents or under applicable law. For avoidance of doubt, all additional amounts payable hereunder shall include, without limitation, Break Funding Indemnification and Cost of Prepayment, if any.

**12. POWER TO CONFESS JUDGMENT:** The Borrower hereby empowers any attorney of any court of record, after the occurrence of any Event of Default hereunder, to appear for the Borrower and, with or without complaint filed, confess judgment, or a series of judgments, against the Borrower in favor of Lender or any holder hereof for the entire unpaid principal balance of this Note, all accrued interest and all other amounts due hereunder, together with costs of suit and attorneys' fees, and for doing so, this Note or a copy verified by affidavit shall be a sufficient warrant. The Borrower hereby forever waives and releases all errors in said proceedings and all rights of appeal and all relief from any and all appraisement, stay or exemption laws of any state now in force or hereafter enacted. Interest on any such judgment shall accrue at the statutory rate permitted under Illinois law.

No single exercise of the foregoing power to confess judgment, or a series of judgments, shall be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but the power shall continue undiminished and it may be exercised from time to time as often as Lender shall elect until such time as Lender shall have received payment in full of the debt, interest and costs. Notwithstanding the attorney's commission provided for in the preceding paragraph (which is included in the warrant for purposes of establishing a sum certain), the amount of attorneys' fees that Lender may recover from the Borrower shall not exceed the actual attorneys' fees incurred by Lender.

**13. RIGHT OF SETOFF:** In addition to all liens upon and rights of setoff against the Borrower's money, securities or other property given to Lender by law, Lender shall have, with respect to the Borrower's obligations to Lender under this Note and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Borrower hereby grants Lender a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to Lender, all of the Borrower's right, title and interest in and to, all of the Borrower's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, Lender or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to the Borrower. Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of Lender, although Lender may enter such

and records at a later time.

**14. ANTI-MONEY LAUNDERING/INTERNATIONAL TRADE LAW COMPLIANCE:** The Borrower represents and warrants to the Lender, as of the date of this Note, the date of each advance of proceeds under the Facility, the date of any renewal, extension or modification of the Facility, and at all times until the Facility has been terminated and all amounts thereunder have been indefeasibly paid in full, that: (a) no Covered Entity (i) is a Sanctioned Person; (ii) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person; or (iii) does business in or with, or derives any of its operating income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any law, regulation, order or directive enforced by any Compliance Authority; (b) the proceeds of the Facility will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Country or Sanctioned Person in violation of any law, regulation, order or directive enforced by any Compliance Authority. (c) the funds used to repay the Facility are not derived from any unlawful activity; and (d) each Covered Entity is in compliance with, and no Covered Entity engages in any dealings or transactions prohibited by, any laws of the United States, including but not limited to any Anti-Terrorism Laws. Borrower covenants and agrees that it shall immediately notify the Lender in writing upon the occurrence of a Reportable Compliance Event.

As used herein: "**Anti-Terrorism Laws**" means any laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering, or bribery, all as amended, supplemented or replaced from time to time; "**Compliance Authority**" means each and all of the (a) U.S. Treasury Department/Office of Foreign Assets Control, (b) U.S. Treasury Department/Financial Crimes Enforcement Network, (c) U.S. State Department/Directorate of Defense Trade Controls, (d) U.S. Commerce Department/Bureau of Industry and Security, (e) U.S. Internal Revenue Service, (f) U.S. Justice Department, and (g) U.S. Securities and Exchange Commission; "**Covered Entity**" means the Borrower, its affiliates and subsidiaries, all guarantors, pledgors of collateral, all owners of the foregoing, and all brokers or other agents of the Borrower acting in any capacity in connection with the Facility; "**Reportable Compliance Event**" means that any Covered Entity becomes a Sanctioned Person, or is indicted, arraigned, investigated or custodially detained, or receives an inquiry from regulatory or law enforcement officials, in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or self-discovers facts or circumstances implicating any aspect of its operations with the actual or possible violation of any Anti-Terrorism Law; "**Sanctioned Country**" means a country subject to a sanctions program maintained by any Compliance Authority; and "**Sanctioned Person**" means any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions) under any order or directive of any Compliance Authority or otherwise subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

**15. INDEMNITY:** The Borrower agrees to indemnify each of Lender, each legal entity, if any, who controls, is controlled by or is under common control with Lender, and each of their respective directors, officers and employees ("**Indemnified Parties**"), and to defend and hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Borrower), in connection with or arising out of or relating to the matters referred to in this Note or in the other Loan Documents or the use of any advance hereunder, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Borrower, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this section shall survive the termination of this Note, payment of any advance hereunder and the assignment of any rights hereunder. The Borrower may participate at its expense in the defense of any such action or claim.

**16. MISCELLANEOUS:** All notices, demands, requests, consents, approvals and other communications required or permitted hereunder respect to borrowing requests or as otherwise provided in this Note) and will be effective upon receipt. Notices may be given in any manner to which the parties may agree. Without limiting the foregoing, first-class mail, postage prepaid, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices. In addition, the parties agree that Notices may be sent electronically to any electronic address provided by a party from time to time. Notices may be sent to a party's address as set forth above or to such other address as any party may give to the other for such purpose in accordance with this section. No delay or omission on Lender's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will Lender's action or inaction impair any such right or power. Lender's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which Lender may have under other agreements, at law or in equity. No modification, amendment or waiver of, or consent to any departure by the Borrower from, any provision of this Note will be effective unless made in a writing signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Notwithstanding the foregoing Lender may modify this Note for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that Lender shall send a copy of any such modification to the Borrower (which notice may be given by electronic mail). The Borrower agrees to pay on demand, to the extent permitted by law, all costs and expenses incurred by Lender in the enforcement of its rights in this Note and in any security therefor, including without limitation reasonable fees and expenses of Lender's counsel. If any provision of this Note is found to be invalid, illegal or unenforceable in any respect by a court, all the other provisions of this Note will remain in full force and effect. The Borrower and all other makers and endorsers of this Note hereby forever waive presentment, protest, notice of dishonor, and notice of non-payment. The Borrower also waives all defenses based on suretyship or impairment of collateral. If this Note is executed by more than one Borrower, the obligations of such persons or entities hereunder will be joint and several. This Note shall bind the Borrower and its heirs, executors, administrators, successors and assigns, and the benefits hereof shall inure to the benefit of Lender and its successors and assigns; provided, however, that the Borrower may not assign this Note in whole or in part without Lender's written consent and Lender at any time may assign this Note in whole or in part.

This Note has been delivered to and accepted by Lender and will be deemed to be made in the State of Illinois ("**State**"). THIS NOTE WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF LENDER AND THE BORROWER DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE, EXCLUDING ITS CONFLICT OF LAWS RULES, INCLUDING WITHOUT LIMITATION THE ELECTRONIC TRANSACTIONS ACT (OR EQUIVALENT) IN EFFECT IN THE STATE (OR, TO THE EXTENT CONTROLLING, THE LAWS OF THE UNITED STATES OF AMERICA, INCLUDING WITHOUT LIMITATION, THE ELECTRONIC SIGNATURES IN GLOBAL AND NATIONAL COMMERCE ACT). The Borrower hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district of the State; provided that nothing contained in this Note will prevent Lender from bringing any action, enforcing any award or judgment or exercising any rights against the Borrower individually, against any security or against any property of the Borrower within any other county, state or other foreign or domestic jurisdiction. The Borrower acknowledges and agrees that the venue provided above is the most convenient forum for both Lender and the Borrower. The Borrower waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Note.

**17. COMMERCIAL PURPOSE:** The Borrower represents that the indebtedness evidenced by this Note is being incurred by the Borrower solely for the purpose of acquiring or carrying on a business, professional or commercial activity, and not for personal, family or household purposes.

**18. USA PATRIOT ACT NOTICE:** To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each Borrower that opens an account. What this means: when the Borrower opens an account, Lender will ask for the business name, business address, taxpayer identifying number and other information that will allow Lender to identify the Borrower, such as organizational documents. For some businesses and organizations, Lender may also need to ask for identifying information and documentation relating to certain individuals associated with the business or organization.

**19. REPRESENTATION BY COUNSEL:** The Borrower hereby represents that it has been represented by competent counsel of its choice, or has knowingly waived its right to use and retain counsel, in the negotiation and execution of this Note and the other Loan Documents; that it has read and fully understood the terms hereof; that the Borrower and any retained counsel

of this Note and the other Loan Documents; and that it intends to be bound hereby. In accordance with the foregoing, the general rule of construction to the effect that any ambiguities in a contract are to be resolved against the party drafting the contract shall not be employed in the construction and interpretation of this Note or any other Loan Document.

**20. CREDIT AGREEMENTS ACT:** The Borrower expressly agrees that for purposes of this Note and the other Loan Documents: (i) this Note and the other Loan Documents shall be a "credit agreement" under the Illinois Credit Agreements Act, 815 ILCS 160/1, et seq. (the "Credit Agreements Act"); (ii) the Credit Agreements Act applies to this transaction including, but not limited to, the execution of this Note and the other Loan Documents; and (iii) any action on or in any way related to this Note and each and the Note shall be governed by the Credit Agreements Act.

**21. ELECTRONIC SIGNATURES AND RECORDS:** Notwithstanding any other provision herein, the Borrower agrees that this Note, the Loan Documents, any amendments thereto, and any other information, notice, signature card, agreement or authorization related thereto (each, a "**Communication**") may, at the Lender's option, be in the form of an electronic record. Any Communication may, at the Lender's option, be signed or executed using electronic signatures. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Lender of a manually-signed, paper Communication which has been converted into electronic form (such as a scanned into PDF format) for transmission, delivery and/or retention.

each Borrower who is an individual provides written authorization to Lender or its designee (and any assignee or potential assignee hereof) to obtain the Borrower's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile in considering this Note and subsequently for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account.

**23. IMPORTANT INFORMATION ABOUT PHONE CALLS:** By providing telephone number(s) to Lender, now or at any later time, Borrower authorizes Lender and its affiliates and designees to contact Borrower regarding Borrower account(s) with Lender or its affiliates, whether such accounts are Borrower's individual accounts or business accounts for which Borrower is a contact, at such numbers using any means, including but not limited to placing calls using an automated dialing system to cell, VoIP or other wireless phone number, or leaving prerecorded messages or sending text messages, even if charges may be incurred for the calls or text messages. Borrower consents that any phone call with Lender may be monitored or recorded by Lender.

**24. WAIVER OF JURY TRIAL: THE BORROWER IRREVOCABLY WAIVES ANY AND ALL RIGHTS THE BORROWER MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS NOTE, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS NOTE OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE BORROWER ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.**

**The Borrower acknowledges that it has read and understood all the provisions of this Note, including the confession of judgment and waiver of jury trial, and has been advised by counsel as necessary or appropriate.**

**WITNESS** the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

| Witness / Attest: | Borrower: PAN OPTIC IMAGING LLC (an Illinois limited liability company) |
|---|---|
| Signature X | Signature X |
| Print Name Dene Suhail | Print Name Sameer Suhail (SEAL) |
| Title* MEMBER | Title MEMBER |
| Date 7/16/18 | Date 7/16/18 |

*Include title only if an officer of entity is signing to the right.

**PNC**
EQUIPMENT FINANCE

**Security Agreement**
**(Equipment and Fixtures)**

EXHIBIT
2
E39

**THIS SECURITY AGREEMENT** (together with all amendments, supplements and other modifications, this "**Agreement**") executed in Ohio, as of this 17th day of July, 2018, by **PAN OPTIC IMAGING LLC** (together with its permitted successors and assigns, heirs and personal representatives, "**Grantor**"), whose mailing address is 155 N Michigan Avenue, Chicago, IL 60601 to **PNC EQUIPMENT FINANCE, LLC** ("**PNCEF**"), with its principal office at 995 Dalton Avenue, Cincinnati, OH 45203.

## Agreement

**1.   GRANT OF INTEREST:**  Grantor hereby grants to PNCEF a security interest in all of Grantor's right, title and interest in the Collateral. "**Collateral**" means, collectively, the following property of Grantor: the Equipment and Fixtures described on Schedule A to this Agreement, in which Grantor now has or hereafter acquires any rights, together with all attachments, accessories, replacements, additions and substitutions therefor, wherever located and whether now existing or hereafter acquired or created, all General Intangibles and Software embedded therein or integrated therewith, all Chattel Paper and Documents describing or covering all or any part of the Equipment and Fixtures described herein, all books and records related thereto, and all Proceeds thereof.

This Collateral secures the full and prompt payment to PNCEF of all obligations of Grantor to PNCEF, or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc. ("**PNCEF Affiliate**"), whether incurred directly or acquired by purchase, pledge, or otherwise and whether participated to or from PNCEF or PNCEF Affiliate in whole or in part, including, without limitation, (a) every such obligation of Grantor whether owing by Grantor alone or with one or more Persons in a joint, several, or joint and several capacity, whether now owing or existing or later arising or created, whether owed absolutely or contingently, whether created by lease, loan, overdraft, guaranty of payment, or other contract, quasi-contract, tort, statute, other operation of law or otherwise and (b) any and all obligations and liabilities of Grantor, whether absolute or contingent, whether now owing or existing or later arising or created, whether evidenced or acquired (including all renewals, extensions, and modifications thereof or substitutions), under (i) any agreement, device or arrangement designed to protect Grantor from fluctuations of interest rates, exchange rates or forward rates, including, but not limited to, dollar-denominated or cross-currency exchange agreements, forward currency exchange agreements, interest rate caps, collars or floors, forward rate currency or interest rate options, puts, warrants, swaps, swaptions, U.S. Treasury locks and U.S. Treasury options, (ii) any other interest rate hedging transactions, such as, but not limited to, managing Grantor's interest rate risk associated with any pending or potential capital market transactions such as fixed rate bond issues and (iii) any and all cancellations, buybacks, reversals, terminations or assignments of any of the foregoing (collectively, "**Subject Obligations**").

**2.   REPRESENTATIONS AND WARRANTIES:**  Grantor represents and warrants to PNCEF as follows:

(a)  **Existence:**  Grantor's legal name is exactly as set forth in the first paragraph of this Agreement.  Grantor is a corporation organized and in good standing under Ohio law.

(b)  **Location:**  Grantor's chief executive office is located at 155 N Michigan Avenue, Suite 634, Chicago, IL 60601.  All Collateral in which Grantor has any rights are, and for the past five years have been, kept at Grantor's chief executive office and at the locations, if any, set forth on Schedule A hereto.

(c)  **Ownership:**  Grantor owns all of the presently existing Collateral, free and clear of any and all adverse claims, assignments, attachments, leases, mortgages, security interests or other liens of any kind or nature ("**Encumbrances**") except those in favor of PNCEF and those consented to in writing by PNCEF (collectively, "**Permitted Encumbrances**").  Each Encumbrance granted hereby, when duly and properly perfected, will be a first priority security interest in the Collateral, prior to all Encumbrances except for Permitted Encumbrances and will secure the payment of the Subject Obligations.

There exists no default under any Collateral consisting of Instruments or contracts by any party thereto.

(d)  **Authority; No Consent:**  Grantor has all right, power and authority to enter into and deliver this Agreement and grant to PNCEF the Encumbrances on the Collateral. This Agreement is a valid obligation of Grantor, enforceable in accordance with its terms.  No consent, authorization, approval or other action of any third party is required for the grant by Grantor of the Encumbrances hereunder.

**3.   COVENANTS:**

(a)  **No Transfer or Encumbrance:**  Grantor agrees that it will not, without in each case obtaining PNCEF's prior written consent, (i) sell, lease, transfer or otherwise dispose of all or any part of the Collateral or license any of the Collateral except as otherwise permitted herein, or (ii) grant any Encumbrances in or permit any Collateral to be or become subject to any Encumbrance except for Permitted Encumbrances.  Grantor shall comply with all applicable laws, rules and regulations related to the Collateral.  Grantor agrees to join PNCEF to take all steps necessary to preserve, protect and defend PNCEF's security interest in the Collateral, at Grantor's expense, as PNCEF may from time to time require.

(b)  **Insurance:**  Grantor will keep the Collateral insured with such insurers, in such amounts (but in no case less than full replacement value thereof) and against all risks to which they may be exposed, as each shall be reasonably acceptable to PNCEF, which policies shall name PNCEF as an additional insured and shall contain satisfactory loss payable clauses in favor of PNCEF and contain insurer's agreement that any loss thereunder shall be payable to PNCEF notwithstanding any action, inaction, or breach of representation or warranty by Grantor.  Annually and upon PNCEF's request, Grantor will deliver to PNCEF certificates evidencing such policies and, upon request, include copies of such policies.  Grantor hereby assigns to PNCEF any returned or unearned premium due upon cancellation of any such insurance and directs any insurer to pay to PNCEF all amounts so due.  Each policy for liability insurance shall provide for all losses to be paid on behalf of Grantor and PNCEF as their interests may appear and each policy for property damage shall provide for losses to be paid to PNCEF.  All amounts received by PNCEF in payment of insurance losses or returned or unearned premiums may, at PNCEF's option, be applied either to the Subject Obligations (with such allocation as to item and maturity as PNCEF may deem advisable) or to the repair, replacement or restoration of the Collateral or either thereof.

(c)  **Inspection:**  Grantor will at all times keep accurate and complete records of the Collateral.  PNCEF and its agents shall have the right at all reasonable times to examine and inspect the Collateral and to make extracts from the books and records related to the Collateral, and to examine, appraise and protect the Collateral.

(d)  **Preservation of Collateral; Risk of Loss:**  The Collateral shall remain personal property at all times and shall not be affixed without PNCEF's prior written consent.  Grantor will maintain the Collateral in good condition and repair, ordinary wear and tear excepted.  Grantor will pay promptly all taxes, levies and all costs of repair, maintenance and preservation.  Grantor bears the risk of loss of the Collateral.

(e)  **Merger; Consolidation:**  Grantor will preserve its existence and will not, in one transaction or in a series of related transactions, merge into or consolidate with any other entity.

**(i)** not less than 30 days' prior written notice of any change in Grantor's name, in the location of its chief executive office or personal residence, or any other information provided under subsection 2(a) or of any other change in circumstances which affects or may affect the continuing efficacy of any financing statement filed by Grantor and PNCEF, or the continuing status of PNCEF's security interest as the first and prior lien on the Collateral,

**(ii)** immediate written notice if any third party claims any Encumbrance on any of the Collateral or claims that Grantor's use thereof infringes or unlawfully conflicts with any rights of such party,

**(iii)** immediate written notice whenever Grantor acquires rights in any Collateral that is subject to (A) a treaty or statute of the United States which provides for national or international registration or certificate of title or which specifies a place of filing different from that specified in the UCC or (B) a certificate of title statute of another jurisdiction under the law of which indication of a security interest is required as a condition of perfection, and

**(iv)** from time to time, upon PNCEF's request, statements and schedules further identifying and describing the Collateral, in form and substance satisfactory to PNCEF.

**(g) Further Assurances:** Grantor agrees to execute and deliver from time to time upon request of PNCEF such other instruments of assignment, conveyance and transfer and take such other action as PNCEF may reasonably request for the purpose of perfecting, continuing, amending, protecting or further evidencing the arrangements contemplated hereby or to enable PNCEF to exercise and enforce its rights and remedies hereunder. Grantor will, at Grantor's expense, upon each request of PNCEF (i) file and hereby authorizes PNCEF to file, from time to time, financing statements or other Records in such public offices as PNCEF may require, together with continuation statements thereof and amendments thereto, containing, among other things, (A) a Collateral description as PNCEF may require, (B) an indication of any Agricultural Liens or other statutory liens held by PNCEF, and (C) Grantor's federal taxpayer identification number, social security number and/or state organizational number, if any, and any other identifying information as PNCEF may require, (ii) place a legend on all Chattel Paper indicating that PNCEF has a security interest in such Chattel Paper, (iii) where the Collateral is in the possession of a third party, join with PNCEF in notifying the third party of PNCEF's security interest and obtaining an acknowledgement from the third party that it is holding the Collateral for the benefit of PNCEF, (iv) if the Collateral is an Instrument, Chattel Paper or Collateral that requires possession to perfect PNCEF's lien thereon or the possession of which grants priority over a person filing a financing statement with respect thereto, deliver such Collateral to PNCEF and (v) comply with every other requirement deemed necessary by PNCEF for the perfection of its security interest in the Collateral. Without diminishing or impairing any of Grantor's obligations hereunder, a photographic, electronic or other reproduction of this Agreement shall be sufficient as a financing statement.

**4. PROVISIONS APPLICABLE TO MOTOR VEHICLES:** If any part of the Collateral shall be a motor vehicle for which a certificate of title may or must be issued, Grantor shall deliver to PNCEF (together with any other documentation requested by PNCEF), promptly after such certificate of title is issued to Grantor, the certificate of title together with such other documentation requested by PNCEF appropriately executed by Grantor so that PNCEF may cause its Encumbrance to be noted on the certificate of title by the appropriate authorities.

**5. ADDITIONAL AUTHORIZATIONS:** PNCEF is hereby appointed Grantor's attorney-in-fact to make adjustments of all insurance losses, to sign all applications, receipts, releases and other papers necessary for the collection of any such loss and any return or unearned premium, to execute proofs of loss, to make settlements, to endorse and collect any check or other item payable to Grantor issued in connection therewith, and to apply the same to the Subject Obligations.

**6. REMEDIES:** If any Event of Default occurs or after demand is made by PNCEF, PNCEF has the right, at its option at any time and from time to time, without notice to Grantor to exercise the following rights and remedies which may be exercised simultaneously:

**(a)** If PNCEF shall have full power and right to exercise any and all rights and remedies available at law (including, without limitation, those afforded by the UCC) or in equity to collect, enforce or satisfy any of the Subject Obligations and exercise any or all of the rights and remedies in respect of the Collateral, including, without limitation, those provided herein or in any Related Writing.

**(b)** PNCEF may enter any premises where the Collateral is located, and take possession of the Collateral or remove the Collateral from such premises. On PNCEF's demand, Grantor will assemble and make the Collateral available to PNCEF at such place or places as PNCEF may reasonably require, all at Grantor's expense.

**(c)** PNCEF may attach, execute or levy on any of the Collateral.

**(d)** PNCEF may retain, take control of or manage all or any Collateral.

**(e)** PNCEF may do all acts and things necessary, in PNCEF's sole discretion, to fulfill Grantor's obligations under Related Writings.

**(f)** PNCEF shall have the right to sell, transfer or otherwise dispose of all or any of the Collateral at any time, or from time to time. PNCEF shall give Grantor commercially reasonable prior notice of either the date after which any intended private sale is to be made or the time and place of any intended public sale, provided that PNCEF need give no such notice in the case of Collateral which PNCEF determines to be declining speedily in value or which is customarily sold on a recognized market. Grantor waives advertisement of any such sale and (except only to the extent notice is specifically required by the next preceding sentence) waives notice of any kind in respect of such sale. PNCEF shall have the right to conduct such sales on Grantor's premises, without charge therefor, and such sales may be adjourned from time to time in accordance with applicable law without further requirement of notice to Grantor. At any public sale PNCEF may purchase the Collateral or any part thereof free from any right of redemption, which right Grantor hereby waives. After deducting all expenses and attorneys' fees incurred in assembling, taking, repairing, storing and selling and delivering the Collateral or any part thereof, PNCEF may apply the net proceeds of the sale to the Subject Obligations with such allocation as to item and maturity as PNCEF in its sole discretion deems advisable, and shall refund the surplus, if any, to Grantor, who shall be liable for any deficiency. PNCEF may sell or otherwise dispose of the Collateral without giving any warranties as to the Collateral and may specifically disclaim any warranties of title or the like, any or all of which will not be considered adversely to affect the commercial reasonableness of any sale or other disposition of the Collateral. Grantor permits PNCEF to disclaim all representations and warranties provided under the UCC in any foreclosure sale contracts.

**7. INDEMNITY; FEES AND EXPENSES:** Grantor agrees to indemnify PNCEF from and against any and all claims, losses, and liabilities, except those resulting from PNCEF's gross negligence or willful misconduct. Grantor will reimburse PNCEF, on demand, for any and all fees, costs, and expenses (including, without limitation, reasonable attorneys' fees) incurred by PNCEF prior to trial, at trial and at all post trial and appellate proceedings, including post petition fees incurred in a bankruptcy or similar insolvency or liquidation proceeding, whether or not suit be brought, in (a administration of this Agreement, (b) custody, preservation, sale, use, collection or realization of the Collateral, (c) protection or enforcement of its rights in the Collateral or under this Agreement including, without limitation, uniform commercial code searches, judgment and tax lien searches for Grantor and each guarantor of the Subject Obligations, recordation taxes, documentary stamp taxes, transfer taxes and filing and recording fees or (d) failure of Grantor to perform or observe any provisions hereof.

**8. PNC MAY PERFORM:** If Grantor fails to perform any agreement contained herein, PNCEF may itself perform (but is not required to perform) or cause performance of, such agreement, and the expenses of PNCEF incurred in connection therewith shall be payable by Grantor upon PNCEF's demand. If Grantor does not reimburse PNCEF, such amounts paid will become part of the Subject Obligations and will be secured hereunder. The powers conferred on PNCEF hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers.

**9. NOTICES:** Each notice to Grantor shall be in writing and shall be deemed to have been given or made when sent to Grantor, by certified mail, return receipt requested, or nationally recognized overnight courier service to the address of Grantor set forth herein or at such other address as Grantor

effective when delivered to PNCEF at its office (at the address set forth above) or at such other address as PNCEF may furnish to Grantor. Grantor assumes all risks arising out of or in connection with each notice given hereunder.

**10. DEFINITIONS:** As used in this Agreement, the following terms shall have the following meanings: (a) "**Event of Default**" means any event of default as defined and occurring under any Related Writing; (b) "Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form; (c) "**Related Writing**" means a Record of any kind that (i) evidences the Subject Obligations or pursuant to which any Subject Obligations is issued, (ii) evidences any Collateral or any interest therein or Proceeds thereof or which otherwise relates thereto in any manner and includes, without limitation, any warehouse receipt, bill of lading, certificate or affidavit, assignment, endorsement, trust receipt, contract of sale, lease, invoice or check, or (iii) is a financial statement, audit report, opinion, notice, certificate or other Record of any kind that is furnished to PNCEF by Grantor or by any officer, partner, employee, agent, auditor or counsel of Grantor; and (d) "**UCC**" means the Uniform Commercial Code as currently in effect in the jurisdiction as indicated in Section 11 hereof and as the Uniform Commercial Code may hereafter be amended, adopted and effective in such jurisdiction. All terms used in this Agreement which are defined under the UCC and not otherwise defined herein, including, without limitation, all terms relating to the Collateral, shall have the meaning as set forth in the UCC.

**11. GENERAL PROVISIONS:** The provisions of this Agreement shall be binding upon the successors, assigns, heirs and personal representatives of the parties hereto. No single or partial exercise of any right, power or privilege shall preclude any further or other exercise thereof or of any other right, power or privilege, as each such right, power or privilege may be exercised either independently or concurrently with others and as often and in such order as PNCEF may deem expedient. This Agreement contains the entire security agreement between Grantor and PNCEF and may be in addition to other security agreements executed by Grantor in favor of PNCEF. If any one or more of the provisions hereof should be invalid, illegal or unenforceable in any respect, the finding shall only affect the provisions found to be void and the remaining provisions shall not be impaired. No course of dealing in respect of, nor any omission or delay in the exercise of, any right, power or privilege by PNCEF under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any further or other exercise thereof or of any other right, power or privilege, as each such right, power or privilege may be exercised either independently or concurrently with others and in such order as PNCEF may deem expedient. The provisions of this Agreement may be modified, altered or amended only by written agreement signed by PNCEF and Grantor. PNCEF shall be entitled to equitable remedies with respect to each breach of any provision of this Agreement, and Grantor hereby waives any defense that might be asserted to bar any such equitable remedy. PNCEF shall have the right to apply proceeds and payments in respect of the Subject Obligations with such allocation to the respective parts thereof and the respective due dates thereof as PNCEF in its sole discretion may from time to time deem advisable. Each right, power or privilege is in addition to and not in limitation of any other rights, powers and privileges that PNCEF may otherwise have or acquire by operation of law (including, without limitation, the right of offset), by other contract or otherwise. This Agreement shall be governed by the laws of the State of Ohio without regard to its conflicts of law provisions that would give effect to the laws of another jurisdiction.

**12. COUNTERPARTS; FACSIMILE SIGNATURES; NON-PAPER RECORDS:** This Agreement may be signed or otherwise authenticated in any number of counterparts and by different parties to this Agreement on separate counterparts, each of which, when so authenticated, shall be deemed an original, but all such counterparts shall constitute one and the same Agreement. Any signature or other authentication delivered by facsimile or electronic transmission shall be deemed to be an original signature hereto. Each party who signs or otherwise authenticates this Agreement hereby (a) agrees that PNCEF may create a duplicate of this Agreement by storing an image of it in an electronic or other medium (a "**Non-Paper Record**"); (b) agrees that, after creating the Non-Paper Record, PNCEF may discard or destroy the original in reliance on this paragraph; (c) agrees that the Non-Paper Record and any perceivable form of the Non-Paper Record shall be treated as the original for all purposes; and (d)

expressed in perceivable form shall be a signed or authenticated record of this Agreement. This Agreement, when signed or authenticated pursuant to this section shall be evidence of the existence of this Agreement and may be received in all courts and public places as conclusive evidence of the existence of this Agreement and that this Agreement was duly executed by the parties of this Agreement.

**13. DEFEASANCE:** PNCEF's security interest in the Collateral shall remain in effect in accordance with this Agreement until the Subject Obligations has been fully satisfied and shall not be affected by the lapse of time or by the fact that there may be a time or times when no Subject Obligations is outstanding. If and when PNCEF's security interest shall have terminated in accordance with the provisions of this Agreement, Grantor agrees to pay to PNCEF, on demand, an amount equal to all reasonable costs and expenses incurred by PNCEF in terminating its security interests.

**14. JURISDICTION AND VENUE; WAIVER OF JURY TRIAL: Grantor and PNCEF, to the fullest extent permissible under applicable law, and for all purposes of this Agreement and any Related Writing, each hereby irrevocably submits to the nonexclusive jurisdiction of the state or federal courts sitting in the State of NC, and irrevocably waives any objection to venue in any such court. GRANTOR HEREBY, AND EACH HOLDER OF THIS AGREEMENT, BY TAKING POSSESSION THEREOF, KNOWINGLY AND VOLUNTARILY WAIVES JURY TRIAL IN RESPECT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED WRITING. EACH HEREBY CERTIFIES THAT THE FOREGOING JURY WAIVER IS A MATERIAL INDUCEMENT TO PNCEF TO ENTER INTO THE TRANSACTION EVIDENCED BY THIS AGREEMENT, AND EACH OF THEM CERTIFIES THAT NO REPRESENTATIVE OF THE OTHER HAS REPRESENTED (EXPRESSLY OR OTHERWISE) THAT THE OTHER WOULD NOT OR MIGHT NOT ENFORCE THIS JURY WAIVER.**

This Agreement is executed as of the date first written above, with the intent to be legally bound hereby.

| Witness / Attest: | Grantor: PAN OPTIC IMAGING LLC |
| | (an Illinois limited liability company) |

| Signature | Signature |
| X | X |
| Print Name | Print Name (SEAL) |
| Deha Suhail | Sameer Suhail |
| Title* | Title |
| MEMBER | MEMBER |
| Date | Date |
| 7/18/18 | 7/18/18 |

*Include title only if an officer of entity is signing to the right



**EQUIPMENT FINANCE**

**Schedule A**

## SPECIFIC COLLATERAL (subsection 1)

| Description | Manufacturer | Serial Number |
|---|---|---|
| (1) GE SIGNA 1.5T 12X HD MRI SYSTEM | | |
| (1) Siemens Biograph 16 PET.CT Scanner | | |
| With all accessories, parts, attachments, service, maint, warranty, training & software | | |

## ADDITIONAL COLLATERAL LOCATIONS (subsection 2(b))

| Street Address | County or Parish | State |
|---|---|---|
| NOT APPLICABLE | | |

7/16 MM Sec Agr Obligor Equipment

E24



**PNC**
EQUIPMENT FINANCE

**Resolutions for Extensions of Credit
& Incumbency Certificate**

As of this 17TH day of July, 2018, the undersigned certifies as follows to PNC Equipment Finance, LLC ("**PNCEF**"):

**1.   NAME OF ENTITY:  PAN OPTIC IMAGING LLC** ("**Entity**")

**2.   ORGANIZATIONAL DOCUMENTS:**  If requested by PNCEF, attached hereto (unless previously delivered to PNCEF) is a true, complete and correct copy of the Entity's organizational documents, with all amendments thereto as in effect on the date hereof.

**3.   ADOPTION OF RESOLUTIONS:**  The Entity is a limited liability company based in or organized under the laws of Illinois, and the undersigned officer, general partners, member or authorized representative of the Entity certifies that the following is a true copy of resolutions ("**Resolutions**") adopted by the Members, Managers, Trustees, Executive Committee, Board of Directors, General Partners, or other governance authority of the Entity pursuant to, and in compliance with, its organizational documents and applicable law, which adoption occurred on a date which is on or before the date of this certificate.  The Resolutions now stand of record on the books of the Entity, are in full force and effect and have not been modified or revoked in any manner whatsoever.

**4.   RESOLUTIONS:**

   **4.1   LOANS AND EXTENSIONS OF CREDIT:**  Resolved, that any one officer or other authorized representative of the Entity holding one of the titles set forth below, as verified by an incumbency certificate executed by the Secretary or Assistant Secretary or other authorized representative(s) of the Entity:

| Name  Sameer Suhail | Title  MEMBER | Signature |
|---|---|---|
| Name  Dena Suhail | Title  MEMBER | Signature |
| Name | Title | Signature |

is hereby authorized, at any time and from time to time:  (A) to obtain financial services and products of any kind from PNCEF or from any other direct or indirect subsidiary of The PNC Financial Services Group, Inc. (collectively, "**PNC**"), including but not limited to loans and other products involving the extension of credit; equipment leases; letters of credit; investment sweep products (whether or not related to a credit product); other treasury management services and products; and capital markets services and products, including but not limited to (x) interest or currency swaps, futures, options, collars, caps, floors, forward rate or other interest rate protection or similar arrangements or any foreign currency transaction or similar transaction providing for the purchase of one currency in exchange for the sale of another currency, (y) equity, credit, or other derivative products, and (z) asset securitizations and other receivables financing transactions; (B) to sell to or discount with PNC any personal property (tangible or intangible), at any time held by the Entity and for such purpose to endorse, assign, transfer and deliver the same to PNC or its agent or designee; (C) to guarantee the payment and performance of the indebtedness and obligations of other persons or entities to PNC; (D) to create or cause the creation of any trusts or other special purpose entities required to be established in connection with any product or service obtained from PNC; (E) to pledge, assign, transfer, mortgage, grant a security interest in or lien on any real or personal property (tangible or intangible) of the Entity or to or in favor of PNC as collateral security for the payment and performance of all loans, advances, debts, liabilities, obligations, covenants and duties of the Entity or of any other persons or entities to PNC (whether or not in connection with a guaranty of such other person's or entity's obligations to PNC); (F) to execute, accept, authorize agreement to and/or deliver to or in favor of PNC such agreements, documents and instruments, required or requested by PNC in connection with any of the foregoing products, services or actions, including but not limited to loan agreements, promissory notes or other evidence of indebtedness, guaranties, equipment leases, letter of credit reimbursement agreements, treasury management service agreements, interest rate or currency protection agreements, equity, credit and other derivative documents (on International Swap Dealers Association forms or otherwise), asset securitization and other receivables financing agreements, trust agreements or other indentures, collateral security documents (including but not limited to security agreements, financing statements, pledge agreements, assignments, mortgages or deeds of trust), and any supporting documents required by the terms of any of the foregoing agreements, documents or instruments; all in such form as may be requested by PNC and any of which may contain a warrant of attorney authorizing PNC to confess judgment against the Entity for all sums due or to become due by the Entity to PNC and/or a provision waiving the right to trial by jury; (G) to execute and deliver to or in favor of PNC any amendments, modifications, renewals or supplements of or to any of the foregoing agreements, documents or instruments; and (H) to take any other action requested, required or deemed advisable by PNC in order to effectuate the foregoing resolution, all such other actions being hereby approved, ratified and confirmed.

   ☐   If the preceding box is checked, the Entity adopts these Resolutions for the purpose of authorizing the persons named above to take the actions described above on behalf of the Entity in its capacity as a general partner of _____, a _____ partnership organized under the laws of the State of _____.

   ☐   If the preceding box is checked, the Entity adopts these Resolutions for the purpose of authorizing the persons named above to take the actions described above on behalf of the Entity in its capacity as a Member of _____, a limited liability company organized under the laws of the State of _____.

   **4.2   MULTIPLE REQUESTS; TRANSACTION ADMINISTRATION:**  Resolved, that in connection with any extension of credit obtained by the persons authorized in Section 4.1 above, (i) any of the persons listed in Section 4.1 (or any other person designated in writing by the designated number of required signers from those listed in Section 4.1) shall be authorized to request multiple draws or advances under an extension of credit, and to perform all other actions and to execute all such documents on behalf of the Entity as are necessary for the administration of the transactions contemplated by the Resolutions, following the execution of the definitive closing documents (collectively, "**Transaction Administration Actions**"), and (ii) any person shall be authorized to take Transaction Administration Actions if they hold one of the following offices or positions with the Entity (or such other office or position as may hereafter be designated in writing by the designated number of required signers from those listed in Section 4.1):

_____

_____

4.3 RATIFICATION: Resolved, that all past acts of officers, partners or other persons acting on behalf of the Entity, as the case may be, following in obtaining credit from PNCEF and in executing documents or otherwise entering into agreements and giving security on behalf of the Entity are hereby ratified and confirmed.

4.4 **TELEPHONIC AND OTHER REQUESTS:** Resolved, that PNCEF is authorized to take any action authorized hereunder based upon: (i) the telephonic or electronic request (including e-mail request) of any person purporting to be a person authorized to act hereunder, (ii) the signature of any person authorized to act hereunder that is delivered to PNCEF personally or by facsimile transmission, or (iii) the telex originated by any of such persons, tested in accordance with such testing procedures as may be established between the Entity and PNCEF from time to time.

4.5 **GENERAL:** Resolved, that a certified copy of these Resolutions be delivered to PNCEF and that they and the authority vested in the persons specified herein will remain in full force and effect until a certified copy of a resolution of the Entity revoking or modifying these resolutions and such authority has been delivered to PNCEF, and PNCEF has had a reasonable time to act thereon.

5. **INCUMBENCY:** Each of the above-named persons holds the office, title or status with the Entity specified in Section 4.1 above, and any signature following a person's name is such person's actual signature.

**IN WITNESS WHEREOF,** and intending to be legally bound hereby, the undersigned have hereunto set their hands as of the date first written above.

Entity: **PAN OPTIC IMAGING LLC**
(an Illinois limited liability company)

| Signature X | Signature X |
|---|---|
| Print Name  DENA SUHAIL | Print Name  SAMEER SUHAIL |
| Title  MEMBER | Title  MEMBER |

9/15 MM Resolutions (All Entities)

EXHIBIT

**3**

E 43

EU3

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC   1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

1495 58497
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Delaware
(S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME Pan Optic Imaging LLC | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 155 N Michigan Ave | CITY Chicago | STATE IL | POSTAL CODE 60601 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME Pan Optic Imaging LLC | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS 155 N Michigan Ave | CITY Chicago | STATE IL | POSTAL CODE 60601 | COUNTRY USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME PNC Equipment Finance, LLC (USD) | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 995 DALTON AVE | CITY CINCINNATI | STATE OH | POSTAL CODE 45203-1101 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:

The Collateral includes the Debtor's items of equipment, inventory, furniture and/or fixtures that are described below or in the attached Addendum, all general intangibles, software and goods relating to, arising from or embedded in any of the foregoing, all supporting obligations of all of the foregoing, and all cash and non-cash proceeds and products (including without limitation insurance proceeds) of all of the foregoing, and all additions and accessions thereto, substitutions therefor and replacements thereof, in each case whether now existing or hereafter acquired or arising and wherever located:
155 N Michigan Avenue, Suite 634, Chicago, IL  5203
SerialNumber  Description                    Quantity  UsageCondition  ModelYear  AssetLocation
R4550        GE Signa MRI System, Siemens Biograph Scanner 1      New                    155 N Michigan Avenue,
CHICAGO, COOK, IL, USA, 60601-7511

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: ▓0267-1 - ▓4952

1495 58497

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

EXHIBIT

4

# PNC
## EQUIPMENT FINANCE

**Guaranty Agreement**

**THIS GUARANTY AGREEMENT** ("**Guaranty**") is made and entered into as of this 17th day of July, 2018 by DENA SUHAIL ("**Guarantor**"), with an address at 401 N Wabash Avenue, Unit 319, Chicago, IL 60601, in consideration of the extension of credit by **PNC EQUIPMENT FINANCE, LLC** ("**PNCEF**"), with an address at 995 Dalton Avenue, Cincinnati, Ohio 45203, to **PAN OPTIC IMAGING LLC** ("**Obligor**"), with an address at 155 N Michigan Avenue, Suite 634, Chicago, IL 60601, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

## Agreement

**1. GUARANTY OF OBLIGATIONS:**

a) The Guarantor hereby unconditionally guarantees, as a primary obligor, and not as a surety for, (i) the prompt payment and performance of the Obligations and (ii) the prompt payment of all costs and expenses of PNCEF (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with the Obligations (collectively, the "**Guaranteed Obligations**"). As used herein, "**Obligations**" means all loans, leases, advances, debts, liabilities, obligations, covenants and duties owing by the Obligor to PNCEF or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Obligor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of PNCEF to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of PNCEF's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements, or (viii) arising from any amendments, extensions, renewals and increases of or to any of the foregoing.

b) Notwithstanding anything to the contrary contained herein, the definition of "**Obligations**" shall specifically exclude any and all Excluded Swap Obligations. The foregoing limitation of the definition of Obligations shall only be deemed applicable to the obligations of the Guarantor (or solely any particular Guarantor(s) if there is more than one Guarantor) under the particular Swap (or Swaps), or, if arising under a master agreement governing more than one Swap, the portion thereof, that constitute Excluded Swap Obligations. As used herein, (i) "**Excluded Swap Obligations**" means, with respect to each Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap if, and to the extent that, all or any portion of this Guaranty that relates to the obligations under such Swap is or becomes illegal as to such Guarantor under the Commodity Exchange Act (7 U.S.C.§1 et seq.), as amended from time to time, and any successor statute ("**CEA**"), or any rule, regulation, or order of the Commodity Futures Trading Commission ("**CFTC**"), by virtue of such Guarantor's failure for any reason to qualify as an "eligible contract participant" (as defined in the CEA and regulations promulgated thereunder) on the Eligibility Date for such Swap; (ii) "**Eligibility Date**" means the date on which this Guaranty becomes effective with respect to the particular Swap (for the avoidance of doubt, the Eligibility Date shall be the date of the execution of the particular Swap if this Guaranty is then in effect, and otherwise it shall be the date of execution and delivery of this Guaranty); and (iii) "**Swap**" means any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder between the Obligor and PNC Bank, National Association other than (A) a swap entered into on, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (B) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

c) If the Obligor defaults under any Obligations, the Guarantor will pay the Guaranteed Obligations due to PNCEF.

**2. NATURE OF GUARANTY; WAIVERS:** This is a guaranty of payment and performance, and not merely of collection, and PNCEF shall not be required or obligated, as a condition of the Guarantor's liability, to make any demand upon or to pursue any of its rights against the Obligor, or to pursue any rights which may be available to it with respect to any other person who may be liable for the payment of the Obligations.

This is an absolute, unconditional, irrevocable and continuing guaranty and will remain in full force and effect until all of the Obligations have been indefeasibly paid in full, and PNCEF has terminated this Guaranty. This Guaranty will remain in full force and effect even if there is no principal balance outstanding under the Obligations at a particular time or from time to time. This Guaranty will not be affected by any surrender, exchange, acceptance, compromise or release by PNCEF of any other party, or any other guaranty or any security held by it for any of the Obligations, by any failure of PNCEF to take any steps to perfect or maintain its lien or security interest in or to preserve its rights to any security or other collateral for any of the Obligations or any guaranty, or by any irregularity, unenforceability or invalidity of any of the Obligations or any part thereof or any security or other guaranty thereof. The Guarantor's obligations hereunder shall not be affected, modified or impaired by any counterclaim, set-off, recoupment, deduction or defense based upon any claim the Guarantor may have (directly or indirectly) against the Obligor or PNCEF, except payment or performance of the Obligations.

Notice of acceptance of this Guaranty, notice of extensions of credit to the Obligor from time to time, notice of default, diligence, presentment, notice of dishonor, protest, demand for payment, and any defense based upon PNCEF's failure to comply with the notice requirements under Sections 9-611 and 9-612 of the Uniform Commercial Code as in effect from time to time are hereby waived. The Guarantor waives all defenses based on suretyship or impairment of collateral.

PNCEF at any time and from time to time, without notice to or the consent of the Guarantor, and without impairing or releasing, discharging or modifying the Guarantor's liabilities hereunder, may (a) change the manner, place, time or terms of payment or performance of or interest rates on, or other terms relating to, any of the Obligations; (b) renew, substitute, modify, amend or alter, or grant consents or waivers relating to any of the Obligations, any other guaranties, or any security for any Obligations or guaranties; (c) apply any and all payments by whomever paid or however realized including any proceeds of any collateral, to any Obligations of the Obligor in such order, manner and amount as PNCEF may determine in its sole discretion; (d) settle, compromise or deal with any other person, including the Obligor or the Guarantor, with respect to any Obligations in

such manner as PNCEF deems appropriate in its sole discretion; (e) substitute, exchange or release any security or guaranty; or (f) take such actions and exercise such remedies hereunder as provided herein.

PNCEF at any time and from time to time, without notice to or the consent of the Guarantor, and without impairing or releasing, discharging or modifying the Guarantor's liabilities hereunder, may (a) change the manner, place, time or terms of payment or performance of or interest rates on, or other terms relating to, any of the Obligations; (b) renew, substitute, modify, amend or alter, or grant consents or waivers relating to any of the Obligations, any other guaranties, or any security for any Obligations or guaranties; (c) apply any and all payments by whomever paid or however realized including any proceeds of any collateral, to any Obligations of the Obligor in such order, manner and amount as PNCEF may determine in its sole discretion; (d) settle, compromise or deal with any other person, including the Obligor or the Guarantor, with respect to any Obligations in such manner as PNCEF deems appropriate in its sole discretion; (e) substitute, exchange or release any security or guaranty; or (f) take such actions and exercise such remedies hereunder as provided herein.

**3. REPAYMENTS OR RECOVERY FROM PNCEF:** If any demand is made at any time upon PNCEF for the repayment or recovery of any amount received by it in payment or on account of any of the Obligations and if PNCEF repays all or any part of such amount by reason of any judgment, decree or order of any court or administrative body or by reason of any settlement or compromise of any such demand, the Guarantor will be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never been received originally by PNCEF. The provisions of this section will be and remain effective notwithstanding any contrary action which may have been taken by the Guarantor in reliance upon such payment, and any such contrary action so taken will be without prejudice to PNCEF's rights hereunder and will be deemed to have been conditioned upon such payment having become final and irrevocable.

**4. FINANCIAL STATEMENTS:** Unless compliance is waived in writing by PNCEF or until all of the Obligations have been paid in full, the Guarantor will promptly submit to PNCEF such information relating to the Guarantor's affairs (including but not limited to annual financial statements and tax returns for the Guarantor) or any security for the Guaranty as PNCEF may reasonably request.

**5. ENFORCEABILITY OF OBLIGATIONS:** No modification, limitation or discharge of the Obligations arising out of or by virtue of any bankruptcy, reorganization or similar proceeding for relief of debtors under federal or state law will affect, modify, limit or discharge the Guarantor's liability in any manner whatsoever and this Guaranty will remain and continue in full force and effect and will be enforceable against the Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted. The Guarantor waives all rights and benefits which might accrue to it by reason of any such proceeding and will be liable to the full extent hereunder, irrespective of any modification, limitation or discharge of the liability of the Obligor that may result from any such proceeding.

The Guarantor expressly waives the effect of any statute of limitations or other limitations on any actions under this Guaranty.

**6. EVENTS OF DEFAULT:** The occurrence of any of the following shall be an "**Event of Default**": (i) any Event of Default (as defined in any of the Obligations); (ii) any default under any of the Obligations that does not have a defined set of "Events of Default" and the lapse of any notice or cure period provided in such Obligations with respect to such default; (iii) demand by PNCEF under any of the Obligations that have a demand feature; (iv) the Guarantor's failure to perform any of its obligations hereunder; (v) the falsity, inaccuracy or material breach by the Guarantor of any written warranty, representation or statement made or furnished to PNCEF by or on behalf of the Guarantor; or (vi) the termination or attempted termination of this Guaranty. Upon the occurrence of any Event of Default, (a) the Guarantor shall pay to PNCEF the amount of the Guaranteed Obligations; or (b) on demand of PNCEF, the Guarantor shall immediately deposit with PNCEF, in U.S. dollars, all amounts due or to become due under the Guaranteed Obligations, and PNCEF may at any time use such funds to repay the Guaranteed Obligations; or (c) PNCEF in its discretion may exercise with respect to any collateral any one or more of the rights and remedies provided a secured party under the applicable version of the Uniform Commercial

Code; or (d) PNCEF in its discretion may exercise from time to time any other rights and remedies available to it at law, in equity or otherwise.

**7. RIGHT OF SETOFF:** In addition to all liens upon and rights of setoff against the Guarantor's money, securities or other property given to PNCEF by law, PNCEF shall have, with respect to the Guarantor's obligations to PNCEF under this Guaranty and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Guarantor hereby grants PNCEF a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to PNCEF all of the Guarantor's right, title and interest in and to, all of the Guarantor's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, PNCEF or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to the Guarantor. Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of PNCEF, although PNCEF may enter such setoff on its books and records at a later time.

**8. COLLATERAL:** This Guaranty is secured by the property described in any collateral security documents which the Guarantor executes and delivers to PNCEF and by such other collateral as previously may have been or may in the future be granted to PNCEF to secure any obligations of the Guarantor to PNCEF.

**9. COSTS:** To the extent that PNCEF incurs any costs or expenses in protecting or enforcing its rights under the Obligations or this Guaranty, including reasonable attorneys' fees and the costs and expenses of litigation, such costs and expenses will be due on demand, will be included in the Guaranteed Obligations and will bear interest from the incurring or payment thereof at the Default Rate (as defined in any of the Obligations).

**10. POSTPONEMENT OF SUBROGATION:** Until the Obligations are indefeasibly paid in full, expire, are terminated and are not subject to any right of revocation or rescission, the Guarantor postpones and subordinates in favor of PNCEF or its designee (and any assignee or potential assignee), any and all rights which the Guarantor may have to (a) assert any claim whatsoever against the Obligor based on subrogation, exoneration, reimbursement, or indemnity or any right of recourse to security for the Obligations with respect to payments made hereunder, and (b) any realization on any property of the Obligor, including participation in any marshalling of the Obligor's assets.

**11. POWER TO CONFESS JUDGMENT:** The Guarantor hereby empowers any attorney of any court of record, after the occurrence of **any Event of Default hereunder, to appear for the Guarantor and, with or without complaint filed, confess judgment, or a series of judgments, against the Guarantor in favor of PNCEF or any holder hereof for the entire unpaid amount of the Guaranteed Obligations and reasonable attorneys' fees, and for doing so, this Guaranty or a copy verified by affidavit shall be a sufficient warrant. The Guarantor hereby forever waives and releases all errors in said proceedings and all rights of appeal and all relief from any and all appraisement, stay or exemption laws of any state now in force or hereafter enacted. Interest on any such judgment shall accrue at the statutory rate permitted under Illinois law.**

No single exercise of the foregoing power to confess judgment, or a series of judgments, shall be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but the power shall continue undiminished and it may be exercised from time to time as often as PNCEF shall elect until such time as PNCEF shall have received payment in full of the Guaranteed Obligations and costs. Notwithstanding the attorney's commission provided for in the preceding paragraph (which is included in the warrant for purposes of establishing a sum certain), the amount of attorneys' fees that PNCEF may recover from the Guarantor shall not exceed the actual attorneys' fees incurred by PNCEF.

other communications required or permitted hereunder ("**Notices**") must be in writing and will be effective upon receipt. Notices may be given in any manner to which PNCEF and the Guarantor may separately agree, including electronic mail. Without limiting the foregoing, first-class mail, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices. Regardless of the manner in which provided, Notices may be sent to addresses for PNCEF and the Guarantor as set forth above or to such other address as either may give to the other for such purpose in accordance with this section.

**13. PRESERVATION OF RIGHTS:** No delay or omission on PNCEF's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will PNCEF's action or inaction impair any such right or power. PNCEF's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which PNCEF may have under other agreements, at law or in equity. PNCEF may proceed in any order against the Obligor, the Guarantor or any other obligor of, or any collateral securing, the Obligations.

**14. ILLEGALITY:** If any provision contained in this Guaranty should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Guaranty.

**15. CHANGES IN WRITING:** No modification, amendment or waiver of, or consent to any departure by the Guarantor from, any provision of this Guaranty will be effective unless made in a writing signed by PNCEF, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Notwithstanding the foregoing, PNCEF may modify this Guaranty for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that PNCEF shall send a copy of any such modification to the Guarantor (which notice may be given by electronic mail). No notice to or demand on the Guarantor will entitle the Guarantor to any other or further notice or demand in the same, similar or other circumstance.

**16. ENTIRE AGREEMENT:** This Guaranty (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the Guarantor and PNCEF with respect to the subject matter hereof; provided, however, that this Guaranty is in addition to, and not in substitution for, any other guarantees from the Guarantor to PNCEF.

**17. SUCCESSORS AND ASSIGNS:** This Guaranty will be binding upon and inure to the benefit of the Guarantor and PNCEF and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Guarantor may not assign this Guaranty in whole or in part without PNCEF's prior written consent and PNCEF at any time may assign this Guaranty in whole or in part.

**18. INTERPRETATION:** In this Guaranty, unless PNCEF and the Guarantor otherwise agree in writing, the singular includes the plural and the plural the singular; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or," the words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation"; and references to sections or exhibits are to those of this Guaranty. Section headings in this Guaranty are included for convenience of reference only and shall not constitute a part of this Guaranty for any other purpose. If this Guaranty is executed by more than one party as Guarantor, the obligations of such persons or entities will be joint and several.

**19. ANTI-MONEY LAUNDERING/INTERNATIONAL TRADE LAW COMPLIANCE:** The Guarantor represents and warrants to PNCEF, as of the date of this Guaranty, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any loan, and at all times any Obligations exist that: (A) no Guarantor (i) is listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejections of transactions) under any order or directive of any Compliance Authority; (ii) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person; or (iii) does business in or with, or derives

Sanctioned Person or Sanctioned Country in violation of any law or regulation enforced by any Compliance Authority; (B) the proceeds of any loan will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Country; and (C) each Guarantor is in compliance with, and no Guarantor engages in any dealings or transactions prohibited by, any laws of the United States including the USA Patriot Act, the Trading with the Enemy Act, or the U.S. Foreign Corrupt Practices Act of 1977, all as amended, supplemented or replaced from time to time. As used herein: "**Compliance Authority**" means each and all of the (a) U.S. Department of the Treasury's Office of Foreign Asset Control; (b) U.S. Treasury Department/Financial Crimes Enforcement Network; (c) U.S. State Department/Directorate of Defense Trade Controls; (d) U.S. Commerce Department/Bureau of Industry and Security; (e) U.S. Internal Revenue Service; (f) U.S. Justice Department; and (g) U.S. Securities and Exchange Commission. "**Sanctioned Country**" means a country subject to a sanctions program maintained by any Compliance Authority. "**Sanctioned Person**" means any individual person, a group, regime, entity or thing subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

**20. INDEMNITY:** The Guarantor agrees to indemnify each of PNCEF, each legal entity, if any, who controls, is controlled by or is under common control with PNCEF and each of their respective directors, officers and employees ("**Indemnified Parties**"), and to defend and hold each Indemnified Party harmless from and against, any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Guarantor, in connection with or arising out of or relating to the matters referred to in this Guaranty, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Guarantor, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this Section shall survive the termination of this Guaranty and assignment of any rights hereunder. The Guarantor may participate at its expense in the defense of any such claim.

**21. CREDIT AGREEMENTS ACT:** The Guarantor expressly agrees that for purposes of this Guaranty and each other Obligation that the Guarantor is a party to: (i) this Guaranty and each other Obligation that the Guarantor is a party to shall be a "credit agreement" under the Illinois Credit Agreements Act, 815 ILCS 160/1 *et seq.* ("**Act**"); (ii) the Act applies to this transaction including, but not limited to, the execution of this Guaranty; and (iii) any action on or in any way related to this Guaranty shall be governed by the Act.

**22. GOVERNING LAW AND JURISDICTION:** This Guaranty has been delivered to and accepted by PNCEF and will be deemed to be made in the State of Illinois ("**State**"). **This Guaranty will be interpreted and the rights and liabilities of PNCEF and the Guarantor determined in accordance with the laws of the State, excluding its conflict of laws rules.** The Guarantor hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district of the State; provided that nothing contained in this Guaranty will prevent PNCEF from bringing any action, enforcing any award or judgment or exercising any rights against the Guarantor individually, against any security or against any property of the Guarantor within any other county, state or other foreign or domestic jurisdiction. The Guarantor acknowledges and agrees that the venue provided above is the most convenient forum for both PNCEF and the Guarantor. The Guarantor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Guaranty.

**23. LIMITATION OF PERSONAL LIABILITY:** Notwithstanding anything contained herein to the contrary, it is agreed that, unless an exception to the requirements of Regulation B of the Board of Governors of the Federal Reserve System applies in connection with the extension of the Obligations

for the execution of this Guaranty may be deemed an applicant applicant for purposes of such regulation shall not be personally liable under this Guaranty, provided that this provision will not limit PNCEF's right to obtain such judgment, order or other relief against such individual as may be necessary for PNCEF to exercise all of its rights and remedies with respect to assets held jointly as of the date of the Guarantor's most recent financial statement delivered prior to the date hereof or thereafter acquired.

**24. EQUAL CREDIT OPPORTUNITY ACT:** If the Guarantor is not an "applicant for credit" under Section 202.2(e) of the Equal Credit Opportunity Act of 1974 ("**ECOA**"), the Guarantor acknowledges that (i) this Guaranty has been executed to provide credit support for the Obligations, and (ii) the Guarantor was not required to execute this Guaranty in violation of Section 202.7(d) of the ECOA.

**25. AUTHORIZATION TO OBTAIN CREDIT REPORTS:** By signing below, each Guarantor who is an individual provides written authorization to PNCEF or its designee (and any assignee or potential assignee) to obtain the Guarantor's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile in considering this Guaranty and subsequently for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account.

**26. WAIVER OF JURY TRIAL: THE GUARANTOR IRREVOCABLY WAIVES ANY AND ALL RIGHT THE GUARANTOR MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS GUARANTY, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS GUARANTY OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE GUARANTOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.**

The Guarantor acknowledges that it has read and understood all the provisions of this Guaranty, including the confession of judgment and waiver of jury trial, and has been advised by counsel as necessary or appropriate.

WITNESS the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

| Witness / Attest: | Guarantor: DENA SUHAIL (an individual) |
|---|---|
| Signature X | Signature X (SEAL) |
| Print Name SAMEER SUHAIL | Print Name DENA SUHAIL |
| Title* MEMBER | Title MEMBER |
| Date 7/10/18 | Date 7/10/18 |



**EQUIPMENT FINANCE**

**Guaranty Agreement**



EXHIBIT

5

**THIS GUARANTY AGREEMENT** ("Guaranty") is made and entered into as of this 17th day of July, 2018 by SAMEER SUHAIL ("**Guarantor**"), with an address at 401 N Wabash Avenue, Unit 319, Chicago, IL 60601, in consideration of the extension of credit by **PNC EQUIPMENT FINANCE, LLC** ("**PNCEF**"), with an address at 995 Dalton Avenue, Cincinnati, Ohio 45203, to **PAN OPTIC IMAGING LLC** ("**Obligor**"), with an address at 155 N Michigan Avenue, Suite 634, Chicago, IL 60601, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

## Agreement

**1. GUARANTY OF OBLIGATIONS:**

a) The Guarantor hereby unconditionally guarantees, as a primary obligor, and not as a surety for, (i) the prompt payment and performance of the Obligations and (ii) the prompt payment of all costs and expenses of PNCEF (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with the Obligations (collectively, the "**Guaranteed Obligations**"). As used herein, "**Obligations**" means all loans, leases, advances, debts, liabilities, obligations, covenants and duties owing by the Obligor to PNCEF or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Obligor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of PNCEF to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of PNCEF's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements, or (viii) arising from any amendments, extensions, renewals and increases of or to any of the foregoing.

b) Notwithstanding anything to the contrary contained herein, the definition of "**Obligations**" shall specifically exclude any and all Excluded Swap Obligations. The foregoing limitation of the definition of Obligations shall only be deemed applicable to the obligations of the Guarantor (or solely any particular Guarantor(s) if there is more than one Guarantor) under the particular Swap (or Swaps), or, if arising under a master agreement governing more than one Swap, the portion thereof, that constitute Excluded Swap Obligations. As used herein, (i) "**Excluded Swap Obligations**" means, with respect to each Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap if, and to the extent that, all or any portion of this Guaranty that relates to the obligations under such Swap is or becomes illegal as to such Guarantor under the Commodity Exchange Act (7 U.S.C.§1 et seq.), as amended from time to time, and any successor statute ("**CEA**"), or any rule, regulation, or order of the Commodity Futures Trading Commission ("**CFTC**"), by virtue of such Guarantor's failure for any reason to qualify as an "eligible contract participant" (as defined in the CEA and regulations promulgated thereunder) on the Eligibility Date for such Swap; (ii) "**Eligibility Date**" means the date on which this Guaranty becomes effective with respect

to the particular Swap (for the avoidance of doubt, the Eligibility Date shall be the date of the execution of the particular Swap if this Guaranty is then in effect, and otherwise it shall be the date of execution and delivery of this Guaranty); and (iii) "**Swap**" means any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder between the Obligor and PNC Bank, National Association other than (A) a swap entered into on, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (B) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

c) If the Obligor defaults under any Obligations, the Guarantor will pay the Guaranteed Obligations due to PNCEF.

**2. NATURE OF GUARANTY; WAIVERS:** This is a guaranty of payment and performance, and not merely of collection, and PNCEF shall not be required or obligated, as a condition of the Guarantor's liability, to make any demand upon or to pursue any of its rights against the Obligor, or to pursue any rights which may be available to it with respect to any other person who may be liable for the payment of the Obligations.

This is an absolute, unconditional, irrevocable and continuing guaranty and will remain in full force and effect until all of the Obligations have been indefeasibly paid in full, and PNCEF has terminated this Guaranty. This Guaranty will remain in full force and effect even if there is no principal balance outstanding under the Obligations at a particular time or from time to time. This Guaranty will not be affected by any surrender, exchange, acceptance, compromise or release by PNCEF of any other party, or any other guaranty or any security held by it for any of the Obligations, by any failure of PNCEF to take any steps to perfect or maintain its lien or security interest in or to preserve its rights to any security or other collateral for any of the Obligations or any guaranty, or by any irregularity, unenforceability or invalidity of any of the Obligations or any part thereof or any security or other guaranty thereof. The Guarantor's obligations hereunder shall not be affected, modified or impaired by any counterclaim, set-off, recoupment, deduction or defense based upon any claim the Guarantor may have (directly or indirectly) against the Obligor or PNCEF, except payment or performance of the Obligations.

Notice of acceptance of this Guaranty, notice of extensions of credit to the Obligor from time to time, notice of default, diligence, presentment, notice of dishonor, protest, demand for payment, and any defense based upon PNCEF's failure to comply with the notice requirements under Sections 9-611 and 9-612 of the Uniform Commercial Code as in effect from time to time are hereby waived. The Guarantor waives all defenses based on suretyship or impairment of collateral.

PNCEF at any time and from time to time, without notice to or the consent of the Guarantor, and without impairing or releasing, discharging or modifying the Guarantor's liabilities hereunder, may (a) change the manner, place, time or terms of payment or performance of or interest rates on, or other terms relating to, any of the Obligations; (b) renew, substitute, modify, amend or alter, or grant consents or waivers relating to any of the Obligations, any other guaranties, or any security for any Obligations or guaranties; (c) apply any and all payments by whomever paid or however realized including any proceeds of any collateral, to any Obligations of the Obligor in such order, manner and amount as PNCEF may determine in its sole discretion; (d) settle, compromise or deal with any other person, including the Obligor or the Guarantor, with respect to any Obligations in

such manner as PNCEF deems appropriate in its sole discretion; or (f) take such actions and exercise such remedies hereunder as provided herein.

PNCEF at any time and from time to time, without notice to or the consent of the Guarantor, and without impairing or releasing, discharging or modifying the Guarantor's liabilities hereunder, may (a) change the manner, place, time or terms of payment or performance of or interest rates on, or other terms relating to, any of the Obligations; (b) renew, substitute, modify, amend or alter, or grant consents or waivers relating to any of the Obligations, any other guaranties, or any security for any Obligations or guaranties; (c) apply any and all payments by whomever paid or however realized including any proceeds of any collateral, to any Obligations of the Obligor in such order, manner and amount as PNCEF may determine in its sole discretion; (d) settle, compromise or deal with any other person, including the Obligor or the Guarantor, with respect to any Obligations in such manner as PNCEF deems appropriate in its sole discretion; (e) substitute, exchange or release any security or guaranty; or (f) take such actions and exercise such remedies hereunder as provided herein.

**3.  REPAYMENTS OR RECOVERY FROM PNCEF:**  If any demand is made at any time upon PNCEF for the repayment or recovery of any amount received by it in payment or on account of any of the Obligations and if PNCEF repays all or any part of such amount by reason of any judgment, decree or order of any court or administrative body or by reason of any settlement or compromise of any such demand, the Guarantor will be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never been received originally by PNCEF. The provisions of this section will be and remain effective notwithstanding any contrary action which may have been taken by the Guarantor in reliance upon such payment, and any such contrary action so taken will be without prejudice to PNCEF's rights hereunder and will be deemed to have been conditioned upon such payment having become final and irrevocable.

**4.  FINANCIAL STATEMENTS:**  Unless compliance is waived in writing by PNCEF or until all of the Obligations have been paid in full, the Guarantor will promptly submit to PNCEF such information relating to the Guarantor's affairs (including but not limited to annual financial statements and tax returns for the Guarantor) or any security for the Guaranty as PNCEF may reasonably request.

**5.  ENFORCEABILITY OF OBLIGATIONS:**  No modification, limitation or discharge of the Obligations arising out of or by virtue of any bankruptcy, reorganization or similar proceeding for relief of debtors under federal or state law will affect, modify, limit or discharge the Guarantor's liability in any manner whatsoever and this Guaranty will remain and continue in full force and effect and will be enforceable against the Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted. The Guarantor waives all rights and benefits which might accrue to it by reason of any such proceeding and will be liable to the full extent hereunder, irrespective of any modification, limitation or discharge of the liability of the Obligor that may result from any such proceeding.

**The Guarantor expressly waives the effect of any statute of limitations or other limitations on any actions under this Guaranty.**

**6.  EVENTS OF DEFAULT:**  The occurrence of any of the following shall be an "**Event of Default**":  (i) any Event of Default (as defined in any of the Obligations); (ii) any default under any of the Obligations that does not have a defined set of "Events of Default" and the lapse of any notice or cure period provided in such Obligations with respect to such default; (iii) demand by PNCEF under any of the Obligations that have a demand feature; (iv) the Guarantor's failure to perform any of its obligations hereunder; (v) the falsity, inaccuracy or material breach by the Guarantor of any written warranty, representation or statement made or furnished to PNCEF by or on behalf of the Guarantor; or (vi) the termination or attempted termination of this Guaranty.  Upon the occurrence of any Event of Default, (a) the Guarantor shall pay to PNCEF the amount of the Guaranteed Obligations; or (b) on demand of PNCEF, the Guarantor shall immediately deposit with PNCEF, in U.S. dollars, all amounts due or to become due under the Guaranteed Obligations, and PNCEF may at any time use such funds to repay the Guaranteed Obligations; or (c) PNCEF in its discretion may exercise with respect to any collateral any one or more of the rights and remedies provided a secured party under the applicable version of the Uniform Commercial

Code; or (d) PNCEF in its discretion may exercise from time to time any other rights and remedies available to it at law, in equity or otherwise.

**7.  RIGHT OF SETOFF:**  In addition to all liens upon and rights of setoff against the Guarantor's money, securities or other property given to PNCEF by law, PNCEF shall have, with respect to the Guarantor's obligations to PNCEF under this Guaranty and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Guarantor hereby grants PNCEF a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to PNCEF all of the Guarantor's right, title and interest in and to, all of the Guarantor's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, PNCEF or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts.  Every such security interest and right of setoff may be exercised without demand upon or notice to the Guarantor. Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of PNCEF, although PNCEF may enter such setoff on its books and records at a later time.

**8.  COLLATERAL:**  This Guaranty is secured by the property described in any collateral security documents which the Guarantor executes and delivers to PNCEF and by such other collateral as previously may have been or may in the future be granted to PNCEF to secure any obligations of the Guarantor to PNCEF.

**9.  COSTS:**  To the extent that PNCEF incurs any costs or expenses in protecting or enforcing its rights under the Obligations or this Guaranty, including reasonable attorneys' fees and the costs and expenses of litigation, such costs and expenses will be due on demand, will be included in the Guaranteed Obligations and will bear interest from the incurring or payment thereof at the Default Rate (as defined in any of the Obligations).

**10.  POSTPONEMENT OF SUBROGATION:**  Until the Obligations are indefeasibly paid in full, expire, are terminated and are not subject to any right of revocation or rescission, the Guarantor postpones and subordinates in favor of PNCEF or its designee (and any assignee or potential assignee), any and all rights which the Guarantor may have to (a) assert any claim whatsoever against the Obligor based on subrogation, exoneration, reimbursement, or indemnity or any right of recourse to security for the Obligations with respect to payments made hereunder, and (b) any realization on any property of the Obligor, including participation in any marshalling of the Obligor's assets.

**11.  POWER TO CONFESS JUDGMENT:  The Guarantor hereby empowers any attorney of any court of record, after the occurrence of any Event of Default hereunder, to appear for the Guarantor and, with or without complaint filed, confess judgment, or a series of judgments, against the Guarantor in favor of PNCEF or any holder hereof for the entire unpaid amount of the Guaranteed Obligations and reasonable attorneys' fees, and for doing so, this Guaranty or a copy verified by affidavit shall be a sufficient warrant.  The Guarantor hereby forever waives and releases all errors in said proceedings and all rights of appeal and all relief from any and all appraisement, stay or exemption laws of any state now in force or hereafter enacted.  Interest on any such judgment shall accrue at the statutory rate permitted under Illinois law.**

**No single exercise of the foregoing power to confess judgment, or a series of judgments, shall be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but the power shall continue undiminished and it may be exercised from time to time as often as PNCEF shall elect until such time as PNCEF shall have received payment in full of the Guaranteed Obligations and costs.  Notwithstanding the attorney's commission provided for in the preceding paragraph (which is included in the warrant for purposes of establishing a sum certain), the amount of attorneys' fees that PNCEF may recover from the Guarantor shall not exceed the actual attorneys' fees incurred by PNCEF.**

10/15 MM Unlimited Guaranty (No COJ) (IL)

other communications required or permitted hereunder (**"Notices"**) must be in writing and will be effective upon receipt. Notices may be given in any manner to which PNCEF and the Guarantor may separately agree, including electronic mail. Without limiting the foregoing, first-class mail, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices. Regardless of the manner in which provided, Notices may be sent to addresses for PNCEF and the Guarantor as set forth above or to such other address as either may give to the other for such purpose in accordance with this section.

**13. PRESERVATION OF RIGHTS:** No delay or omission on PNCEF's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will PNCEF's action or inaction impair any such right or power. PNCEF's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which PNCEF may have under other agreements, at law or in equity. PNCEF may proceed in any order against the Obligor, the Guarantor or any other obligor of, or any collateral securing, the Obligations.

**14. ILLEGALITY:** If any provision contained in this Guaranty should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Guaranty.

**15. CHANGES IN WRITING:** No modification, amendment or waiver of, or consent to any departure by the Guarantor from, any provision of this Guaranty will be effective unless made in a writing signed by PNCEF, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Notwithstanding the foregoing, PNCEF may modify this Guaranty for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that PNCEF shall send a copy of any such modification to the Guarantor (which notice may be given by electronic mail). No notice to or demand on the Guarantor will entitle the Guarantor to any other or further notice or demand in the same, similar or other circumstance.

**16. ENTIRE AGREEMENT:** This Guaranty (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the Guarantor and PNCEF with respect to the subject matter hereof; provided, however, that this Guaranty is in addition to, and not in substitution for, any other guarantees from the Guarantor to PNCEF.

**17. SUCCESSORS AND ASSIGNS:** This Guaranty will be binding upon and inure to the benefit of the Guarantor and PNCEF and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Guarantor may not assign this Guaranty in whole or in part without PNCEF's prior written consent and PNCEF at any time may assign this Guaranty in whole or in part.

**18. INTERPRETATION:** In this Guaranty, unless PNCEF and the Guarantor otherwise agree in writing, the singular includes the plural and the plural the singular; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or," the words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation"; and references to sections or exhibits are to those of this Guaranty. Section headings in this Guaranty are included for convenience of reference only and shall not constitute a part of this Guaranty for any other purpose. If this Guaranty is executed by more than one party as Guarantor, the obligations of such persons or entities will be joint and several.

**19. ANTI-MONEY LAUNDERING/INTERNATIONAL TRADE LAW COMPLIANCE:** The Guarantor represents and warrants to PNCEF, as of the date of this Guaranty, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any loan, and at all times any Obligations exist that: (A) no Guarantor (i) is listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejections of transactions) under any order or directive of any Compliance Authority; (ii) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person; or (iii) does business in or with, or derives

any of its operating income from, investments in or engagements with any Sanctioned Person or Sanctioned Country in violation of any law or regulation enforced by any Compliance Authority; (B) the proceeds of any loan will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Country; and (C) each Guarantor is in compliance with, and no Guarantor engages in any dealings or transactions prohibited by, any laws of the United States including the USA Patriot Act, the Trading with the Enemy Act, or the U.S. Foreign Corrupt Practices Act of 1977, all as amended, supplemented or replaced from time to time. As used herein: "**Compliance Authority**" means each and all of the (a) U.S. Department of the Treasury's Office of Foreign Asset Control; (b) U.S. Treasury Department/Financial Crimes Enforcement Network; (c) U.S. State Department/Directorate of Defense Trade Controls; (d) U.S. Commerce Department/Bureau of Industry and Security; (e) U.S. Internal Revenue Service; (f) U.S. Justice Department; and (g) U.S. Securities and Exchange Commission. "**Sanctioned Country**" means a country subject to a sanctions program maintained by any Compliance Authority. "**Sanctioned Person**" means any individual person, a group, regime, entity or thing subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

**20. INDEMNITY:** The Guarantor agrees to indemnify each of PNCEF, each legal entity, if any, who controls, is controlled by or is under common control with PNCEF and each of their respective directors, officers and employees ("**Indemnified Parties**"), and to defend and hold each Indemnified Party harmless from and against, any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Guarantor, in connection with or arising out of or relating to the matters referred to in this Guaranty, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Guarantor, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this Section shall survive the termination of this Guaranty and assignment of any rights hereunder. The Guarantor may participate at its expense in the defense of any such claim.

**21. CREDIT AGREEMENTS ACT:** The Guarantor expressly agrees that for purposes of this Guaranty and each other Obligation that the Guarantor is a party to: (i) this Guaranty and each other Obligation that the Guarantor is a party to shall be a "credit agreement" under the Illinois Credit Agreements Act, 815 ILCS 160/1 et seq. ("**Act**"); (ii) the Act applies to this transaction including, but not limited to, the execution of this Guaranty; and (iii) any action on or in any way related to this Guaranty shall be governed by the Act.

**22. GOVERNING LAW AND JURISDICTION:** This Guaranty has been delivered to and accepted by PNCEF and will be deemed to be made in the State of Illinois ("**State**"). **This Guaranty will be interpreted and the rights and liabilities of PNCEF and the Guarantor determined in accordance with the laws of the State, excluding its conflict of laws rules.** The Guarantor hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district of the State; provided that nothing contained in this Guaranty will prevent PNCEF from bringing any action, enforcing any award or judgment or exercising any rights against the Guarantor individually, against any security or against any property of the Guarantor within any other county, state or other foreign or domestic jurisdiction. The Guarantor acknowledges and agrees that the venue provided above is the most convenient forum for both PNCEF and the Guarantor. The Guarantor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Guaranty.

**23. LIMITATION OF PERSONAL LIABILITY:** Notwithstanding anything contained herein to the contrary, it is agreed that, unless an exception to the requirements of Regulation B of the Board of Governors of the Federal Reserve System applies in connection with the extension of the Obligations

that the execution of this Guaranty and spouse who is deemed not to be an
applicant for purposes of such regulation shall not be personally liable under
this Guaranty, provided that this provision will not limit PNCEF's right to
obtain such judgment, order or other relief against such individual as may be
necessary for PNCEF to exercise all of its rights and remedies with respect
to assets held jointly as of the date of the Guarantor's most recent financial
statement delivered prior to the date hereof or thereafter acquired.

**24. EQUAL CREDIT OPPORTUNITY ACT:** If the Guarantor is not an
"applicant for credit" under Section 202.2(e) of the Equal Credit Opportunity
Act of 1974 ("**ECOA**"), the Guarantor acknowledges that (i) this Guaranty has
been executed to provide credit support for the Obligations, and (ii) the
Guarantor was not required to execute this Guaranty in violation of Section
202.7(d) of the ECOA.

**25. AUTHORIZATION TO OBTAIN CREDIT REPORTS:** By signing below,
each Guarantor who is an individual provides written authorization to PNCEF
or its designee (and any assignee or potential assignee) to obtain the
Guarantor's personal credit profile from one or more national credit bureaus.
Such authorization shall extend to obtaining a credit profile in considering this
Guaranty and subsequently for the purposes of update, renewal or extension
of such credit or additional credit and for reviewing or collecting the resulting
account.

**26. WAIVER OF JURY TRIAL: THE GUARANTOR IRREVOCABLY
WAIVES ANY AND ALL RIGHT THE GUARANTOR MAY HAVE TO A
TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY
NATURE RELATING TO THIS GUARANTY, ANY DOCUMENTS
EXECUTED IN CONNECTION WITH THIS GUARANTY OR ANY
TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE
GUARANTOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS
KNOWING AND VOLUNTARY.**

The Guarantor acknowledges that it has read and understood all the provisions of this Guaranty, including the confession of judgment and waiver of jury trial, and has been advised by counsel as necessary or appropriate.

WITNESS the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

| Witness / Attest: | Guarantor: SAMEER SUHAIL |
| | (an Individual) |
| Signature | Signature |
| X | X |
| Print Name | Print Name (SEAL) |
| DENA SUHAIL | SAMEER SUHAIL |
| Title* | Title |
| MEMBER | MEMBER |
| Date | Date |
| 7/19/18 | 7/19/18 |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, successor by merger to PNC EQUIPMENT FINANCE, LLC, | ) ) ) | Case No. 24-1762 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| PAN OPTIC IMAGING LLC, DENA SUHAIL, and SAMEER SUHAIL, | ) ) ) | |
| Defendants. | ) ) | |

## NOTIFICATION AS TO AFFILIATES / CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 3.2, PNC Bank, National Association, successor by merger to PNC Equipment Finance, LLC identifies its affiliates as follows:

PNC Bank is a national banking association and is an indirect subsidiary of The PNC Financial Services Group, Inc. The PNC Financial Services Group, Inc. is a financial holding company trading under the symbol "PNC" on the New York Stock Exchange.

Dated: February 28, 2024

PNC BANK, NATIONAL ASSOCIATION, successor by merger to PNC Equipment Finance, LLC,

By:     /s/ C. Randall Woolley_____
C. Randall Woolley
Darcy & Devassy PC
444 N. Michigan Ave, Suite 3270
Chicago, IL 60611
Tel: (312) 784-2400
Fax; (312) 784-2410
rwoolley@darcydevassy.com